## NORTHWEST AIRLINES, INC. *v.* MINNESOTA.

No. 33. Argued October 19, 20, 1944.—Decided May 15, 1944.

*Mr. Michael J. Doherty,* with whom *Mr. W. E. Rumble* was on the brief, for petitioner.

*Mr. Andrew R. Bratter* and *Mr. George B. Sjoselius,* Assistant Attorney General of Minnesota, with whom *Messrs. J. A. A. Burnquist,* Attorney General, and *James F. Lynch* were on the brief, for respondent.

MR. JUSTICE FRANKFURTER announced the conclusion and judgment of the Court.

The question before us is whether the Commerce Clause or the Due Process Clause of the Fourteenth Amendment bars the State of Minnesota from enforcing the personal property tax it has laid on the entire fleet of airplanes owned by the petitioner and operated by it in interstate transportation. The answer involves the application of

settled legal principles to the precise circumstances of this case. To these, about which there is no dispute, we turn.

Northwest Airlines is a Minnesota corporation and its principal place of business is St. Paul. It is a commercial airline carrying persons, property and mail on regular fixed routes, with due allowance for weather, predominantly within the territory comprising Illinois, Minnesota, North Dakota, Montana, Oregon, Wisconsin and Washington. For all the planes St. Paul is the home port registered with the Civil Aeronautics Authority, under whose certificate of convenience and necessity Northwest operates. At six of its scheduled cities, Northwest operates maintenance bases, but the work of rebuilding and overhauling the planes is done in St. Paul. Details as to stopovers, other runs, the location of flying crew bases and of the usual facilities for aircraft, have no bearing on our problem.

The tax in controversy is for the year 1939. All of Northwest's planes were in Minnesota from time to time during that year. All were, however, continuously engaged in flying from State to State, except when laid up for repairs and overhauling for unidentified periods. On May 1, 1939, the time fixed by Minnesota for assessing personal property subject to its tax (Minn. Stat. 1941, § 273.01), Northwest's scheduled route mileage in Minnesota was 14% of its total scheduled route mileage, and the scheduled plane mileage was 16% of that scheduled. It based its personal property tax return for 1939 on the number of planes in Minnesota on May 1, 1939. Thereupon the appropriate taxing authority of Minnesota assessed a tax against Northwest on the basis of the entire fleet coming into Minnesota. For that additional assessment this suit was brought. The Supreme Court of Minnesota, with three judges dissenting, affirmed the judgment of a lower court in favor of the State. 213 Minn.

395, 7 N. W. 2d 691. A new phase of an old problem led us to bring the case here. 319 U. S. 734.

The tax here assessed by Minnesota is a tax assessed upon "all personal property of persons residing therein, including the property of corporations . . ." Minn. Stat. 1941, § 272.01. It is not a charge laid for engaging in interstate commerce or upon airlines specifically; it is not aimed by indirection against interstate commerce or measured by such commerce. Nor is the tax assessed against planes which were "continuously without the State during the whole tax year," *N. Y. Central & H. R. R. Co.* v. *Miller*, 202 U. S. 584, 594, and had thereby acquired "a permanent location elsewhere," *Southern Pacific Co.* v. *Kentucky*, 222 U. S. 63, 68; and see *Cream of Wheat Co.* v. *Grand Forks*, 253 U. S. 325, 328–330.

Minnesota is here taxing a corporation for all its property within the State during the tax year no part of which receives permanent protection from any other State. The benefits given to Northwest by Minnesota and for which Minnesota taxes—its corporate facilities and the governmental resources which Northwest enjoys in the conduct of its business in Minnesota—are concretely symbolized by the fact that Northwest's principal place of business is in St. Paul and that St. Paul is the "home port" of all its planes. The relation between Northwest and Minnesota—a relation existing between no other State and Northwest—and the benefits which this relation affords are the constitutional foundation for the taxing power which Minnesota has asserted. See *State Tax Comm'n* v. *Aldrich*, 316 U. S. 174, 180. No other State can claim to tax as the State of the legal domicile as well as the home State of the fleet, as a business fact. No other State is the State which gave Northwest the power to be as well as the power to function as Northwest functions in Minnesota; no other State could impose a tax that derives from the significant legal relation of creator and creature

and the practical consequences of that relation in this case. On the basis of rights which Minnesota alone originated and Minnesota continues to safeguard, she alone can tax the personalty which is permanently attributable to Minnesota and to no other State. It is too late to suggest that this taxing power of a State is less because the tax may be reflected in the cost of transportation. See *Delaware Railroad Tax,* 18 Wall. 206, 232.

Such being the case, it is clearly ruled by *N. Y. Central & H. R. R. Co.* v. *Miller, supra.* Here, as in that case, a corporation is taxed for all its property within the State during the tax year none of which was "continuously without the State during the whole tax year." Therefore the doctrine of *Union Transit Co.* v. *Kentucky,* 199 U. S. 194, does not come into play. The fact that Northwest paid personal property taxes for the year 1939 upon "some proportion of its full value" of its airplane fleet in some other States does not abridge the power of taxation of Minnesota as the home State of the fleet in the circumstances of the present case. The taxability of any part of this fleet by any other State than Minnesota, in view of the taxability of the entire fleet by that State, is not now before us. It was not shown in the *Miller* case and it is not shown here that a defined part of the domiciliary corpus has acquired a permanent location, *i. e.,* a taxing situs, elsewhere.[1] That

---

[1] In the *Miller* case, the New York Central Railroad introduced evidence that during the taxable years in question, a proportion of its cars, ranging from about 12% to 64%, was used outside of New York. This figure was arrived at by using the ratio between Central's mileage outside of New York and its total mileage. The comptroller nevertheless ruled that all of Central's cars were taxable in New York, the State of domicile. On review of this ruling as applied in the first tax year involved, the New York Court of Appeals remitted the proceedings to the comptroller to determine whether any of the rolling stock was used exclusively out of the State. 173 N. Y. 255, 65 N. E. 1102. No such evidence was introduced for any tax year, although there was evidence to show "that a certain proportion of cars, although

was the decisive feature of the *Miller* case, and it was deemed decisive as late as 1933 in *Johnson Oil Co.* v. *Oklahoma*, 290 U. S. 158, which was strongly pressed upon us by Northwest. In that case it was not the home State, Illinois, but a foreign State, Oklahoma, which was seeking to tax a whole fleet of tank cars used by the oil company. That case fell outside of the decision of the *Miller* case and ours falls precisely within it. "Appellant had its domicile in Illinois," as Mr. Chief Justice Hughes pointed out, "and that State had jurisdiction to tax appellant's personal property which had not acquired an actual situs elsewhere." 290 U. S. at 161.[2] This constitutional basis for what Minnesota did reflects practicalities in the relations between the States and air transportation. "It has been customary to tax operating airplanes at their overhaul

not the same cars, was continuously without the State during the whole tax year." 202 U. S. 584, 594. The comptroller made no reduction in the tax, and this action was affirmed by the Appellate Division (89 App. Div. 127, 84 N. Y. S. 1088), the Court of Appeals (177 N. Y. 584, 69 N. E. 1129) and on review here.

[2] In the *Johnson Oil Co.* case, *supra*, this Court reaffirmed not less than three times that the State of domicile has jurisdiction to tax the personal property of its corporation unless such property has acquired an "actual situs" in another State. And by "actual situs" it meant, as its references to *Union Transit Co.* v. *Kentucky, supra,* and the *Miller* case indicate, what those cases required for "actual situs" before the constitutional power of the domiciliary State to tax could be curtailed, namely continuous presence in another State which thereby supplants the home State and acquires the taxing power over personalty that has become a permanent part of the foreign State. Surely the situs which personal property may acquire for tax purposes in a State other than that of the owner's domicile cannot be made to depend on some undefined concept of "permanence" short of a tax year, leaving the adequate size of the fraction of the tax year for judicial determination in each year. Such a doctrine would play havoc with the tax laws of the forty-eight States. It would multiply manifold the recognized difficulties of ascertaining the domicile of individuals. See *Texas* v. *Florida,* 306 U. S. 398; *District of Columbia* v. *Murphy,* 314 U. S. 441.

base." Thompson, *State and Local Taxation Affecting Air Transportation* (1933) 4 J. Air L. 479, 483.

The doctrine of tax apportionment for instrumentalities engaged in interstate commerce introduced by *Pullman's Car Co.* v. *Pennsylvania,* 141 U. S. 18, is here inapplicable. The principle of that case is that a non-domiciliary State may tax an interstate carrier "engaged in running railroad cars into, through and out of the State, and having at all times a large number of cars within the State . . . by taking as the basis of assessment such proportion of its capital stock as the number of miles of railroad over which its cars are run within the State bears to the whole number of miles in all the States over which its cars are run." *Union Transit Co.* v. *Kentucky, supra,* at 206. This principle was successively extended to the old means of transportation and communication, such as express companies and telegraph systems. But the doctrine of apportionment has neither in theory nor in practice been applied to tax units of interstate commerce visiting for fractional periods of the taxing year. (Thus, for instance, "The coaches of the company . . . are daily passing from one end of the State to the other," in *Pullman's Car Co.* v. *Pennsylvania, supra,* at 20, citing the opinion of the court below in 107 Pa. 156, 160.) The continuous protection by a State other than the domiciliary State—that is, protection throughout the tax year—has furnished the constitutional basis for tax apportionment in these interstate commerce situations, and it is on that basis that the tax laws have been framed and administered.

The taxing power of the domiciliary State has a very different basis. It has power to tax because it is the State of domicile and no other State is. For reasons within its own sphere of choice Congress at one time chartered interstate carriers and at other times has left the chartering and all that goes with it to the States. That is a practical fact of legislative choice and a practical fact

from which legal significance has always followed. That far-reaching fact was recognized, as a matter of course, by Mr. Justice Bradley in his dissent in the *Pullman's Car Co.* case, *supra*, at 32. Congress of course could exert its controlling authority over commerce by appropriate regulation and exclude a domiciliary State from authority which it otherwise would have because it is the domiciliary State. But no judicial restriction has been applied against the domiciliary State except when property (or a portion of fungible units) is permanently situated in a State other than the domiciliary State.[3] And permanently means continuously throughout the year, not a fraction thereof, whether days or weeks.

Such was the unanimous decision in the *Miller* case or the *Miller* case decided nothing. The present case is precisely the case which Mr. Justice Holmes assumed the *Miller* case to be. By substituting Minnesota for New York we have inescapably the facts of the present case: "Suppose, then, that the State of Minnesota had taxed the property directly, there was nothing to hinder its taxing the whole of it. It is true that it has been decided that property, even of a domestic corporation, cannot be taxed

---

[3] In the most recent apportionment case to come before this Court, *Nashville, C. & St. L. Ry.* v. *Browning,* 310 U. S. 362, we merely sustained the application by the Tennessee Railroad Commission and the Tennessee Supreme Court of a "familiar and frequently sanctioned formula" for apportionment on a mileage basis against the claim of the inapplicability of this formula in the circumstances of that case because of the disparity in the revenue-producing capacity between the lines in and out of Tennessee. Mathematical exactitude in making the apportionment has never been a constitutional requirement. That is the essence of the *Browning* holding. No suggestion can be found at any stage of that litigation in any wise touching the present problem, namely, whether the domiciliary State is constitutionally limited in taxing all the movables that come within it except by the *Union Transit* doctrine, that a proportion which had during the entire tax year been within another State cannot be taxed in the domiciliary State.

if it is permanently out of the State. . . . But it has not been decided, and it could not be decided, that a State may not tax its own corporations for all their property within the State during the tax year, even if every item of that property should be taken successively into another State for a day, a week, or six months, and then brought back. Using the language of domicil, which now so frequently is applied to inanimate things, the State of origin remains the permanent situs of the property, notwithstanding its occasional excursions to foreign parts." *N. Y. Central & H. R. R. Co.* v. *Miller, supra,* at 596–597.[4] Surely, the power of the State of origin to "tax its own corporations for all their property within the State during the tax year" cannot constitutionally be affected whether the property takes fixed trips or indeterminate trips so long as the property is not "continuously without the State during the whole tax year," *N. Y. Central & H. R. R. Co.* v. *Miller, supra,* at 594, even when, as in the *Miller* case, from 12% to 64% of the property was shown to have been used outside of New York during the tax year, but in no one visited State permanently, that is, for the whole year. And that is the decisive constitutional fact about the *Miller* case—that although from 12% to 64% of the rolling stock of the railroad was outside of New York throughout the tax year, New York was nevertheless allowed to tax it all because no part was in any other State throughout the year.

To introduce a new doctrine of tax apportionment as a limitation upon the hitherto established taxing power of the home State is not merely to indulge in constitutional

---

[4] In speaking of "occasional excursions to foreign parts" and "random excursions" (202 U. S. at 597), Mr. Justice Holmes merely put colloquially the legally significant fact that neither any specific cars nor any average of cars was so continuously in any other State as to have been withdrawn from the home State and to have established for tax purposes an adopted home State.

innovation. It is to introduce practical dislocation into the established taxing systems of the States. The doctrine of tax apportionment has been painfully evolved in working out the financial relations between the States and interstate transportation and communication conducted on land and thereby forming a part of the organic life of these States. Although a part of the taxing systems of this country, the rule of apportionment is beset with friction, waste and difficulties, but at all events it grew out of, and has established itself in regard to, land commerce.[5] To what extent it should be carried over to the totally new problems presented by the very different modes of transportation and communication that the airplane and the radio have already introduced, let alone the still more subtle and complicated technological facilities that are on the horizon, raises questions that we ought not to anticipate; certainly we ought not to embarrass the future by judicial answers which at best can deal only in a truncated way with problems sufficiently difficult even for legislative statesmanship.

The doctrine in the *Miller* case, which we here apply, does not subject property permanently located outside of the domiciliary State to double taxation. But not to subject property that has no locality other than the State of its owner's domicile to taxation there would free such floating property from taxation everywhere. And what the *Miller* case decided is that neither the Commerce Clause nor the Fourteenth Amendment affords such constitutional immunity.

Each new means of interstate transportation and communication has engendered controversy regarding the

---

[5] And that the constitutional power of the domiciliary State to tax vessels is precisely the same as its power to tax rolling stock is conclusively shown by the Court's reliance in the *Miller* case on a case decided a week before, namely, *Ayer & Lord Co.* v. *Kentucky*, 202 U. S. 409.

taxing powers of the States *inter se* and as between the States and the Federal Government. Such controversies and some conflict and confusion are inevitable under a federal system. They have long been the source of difficulty and dissatisfaction for us, see J. B. Moore, *Taxation of Movables and the Fourteenth Amendment* (1907) 7 Col. L. Rev. 309; Groves, *Intergovernmental Fiscal Relations,* Proceedings Thirty-fifth Annual Conference, National Tax Association, p. 105, and have equally plagued the British federal systems, see Report of the [Australian] Royal Commission on the Constitution, (1929) c. XII (p. 127), c. XIX (p. 187), c. XXIII (at p. 259); Report of the [Canadian] Royal Commission on Dominion-Provincial Relations, (1940) Bk. I, c. VIII, Bk. II, § B, c. III. In response to arguments addressed also to us about the dangers of harassing state taxation affecting national transportation, the concurring judge below adverts to the power of Congress to incorporate airlines and to control their taxation. But insofar as these are matters that go beyond the constitutional issues which dispose of this case, they are not our concern.

*Affirmed.*

MR. JUSTICE BLACK, concurring:

I concur in the judgment of the Court and in substantially all that is said in the opinion, but I would not in this case foreclose consideration of the taxing rights of States other than Minnesota.

I believe there is small support in reason or in the Constitution for the doctrine that the Commerce Clause in and of itself prohibits a state from applying its general tax laws to transactions and properties in interstate commerce unless it is able to make two correct prophecies as to what this Court ultimately may hold, namely, (1) The permissible total of taxes which might be imposed by an aggregate of states on the taxed properties or transactions; and (2) The proportion of this total which the state itself

fairly may claim. See dissenting opinions in *Adams Manufacturing Co.* v. *Storen,* 304 U. S. 307, 316; *Gwin, White & Prince* v. *Henneford,* 305 U. S. 434, 442. Extension of this dubious doctrine to the new problems of air transport gives promise of little but tax confusion.

The differing views of members of the Court in this and related cases illustrate the difficulties inherent in the judicial formulation of general rules to meet the national problems arising from state taxation which bears in incidence upon interstate commerce. These problems, it seems to me, call for Congressional investigation, consideration, and action. The Constitution gives that branch of government the power to regulate commerce among the states, and until it acts I think we should enter the field with extreme caution. See dissenting opinion, *McCarroll* v. *Dixie Greyhound Lines,* 309 U. S. 176, 183.

MR. JUSTICE JACKSON, concurring:

This case considers for the first time constitutional limitations upon state power to tax airplanes. Several principles of limitation have been judicially evolved in reference to ships and to railroad rolling stock. The question is which, if any, of these should be transferred to air transport.

We are at a stage in development of air commerce roughly comparable to that of steamship navigation in 1824 when *Gibbons* v. *Ogden,* 9 Wheat. 1, came before this Court. Any authorization of local burdens on our national air commerce will lead to their multiplication in this country. Moreover, such an example is not likely to be neglected by other revenue-needy nations as international air transport expands.

Aviation has added a new dimension to travel and to our ideas. The ancient idea that landlordism and sovereignty extend from the center of the world to the periph-

ery of the universe has been modified. Today the landowner no more possesses a vertical control of all the air above him than a shore owner possesses horizontal control of all the sea before him. The air is too precious as an open highway to permit it to be "owned" to the exclusion or embarrassment of air navigation by surface landlords who could put it to little real use.

Students of our legal evolution know how this Court interpreted the commerce clause of the Constitution to lift navigable waters of the United States out of local controls and into the domain of federal control. *Gibbons* v. *Ogden,* 9 Wheat. 1, to *United States* v. *Appalachian Power Co.,* 311 U. S. 377. Air as an element in which to navigate is even more inevitably federalized by the commerce clause than is navigable water. Local exactions and barriers to free transit in the air would neutralize its indifference to space and its conquest of time.

Congress has recognized the national responsibility for regulating air commerce. Federal control is intensive and exclusive. Planes do not wander about in the sky like vagrant clouds. They move only by federal permission, subject to federal inspection, in the hands of federally certified personnel and under an intricate system of federal commands. The moment a ship taxis onto a runway it is caught up in an elaborate and detailed system of controls. It takes off only by instruction from the control tower, it travels on prescribed beams, it may be diverted from its intended landing, and it obeys signals and orders. Its privileges, rights and protection, so far as transit is concerned, it owes to the Federal Government alone and not to any state government.

Congress has not extended its protection and control to the field of taxation, although I take it no one denies that constitutionally it may do so. It may exact a single uniform federal tax on the property or the business to

the exclusion of taxation by the states. It may subject the vehicles or other incidents to any type of state and local taxation, or it may declare them tax-free altogether. Our function is to determine what rule governs in the absence of such legislative enactment.

Certainly today flight over a state either casually or on regular routes and schedules confers no jurisdiction to tax. Earlier ideas of a state's sovereignty over the air above it might argue for such a right to tax, but it is one of those cases where legal philosophy has to take account of the fact that the world does move.

Does the act of landing within a state, even regularly and on schedule, confer jurisdiction to tax? Undoubtedly a plane, like any other article of personal property, could land or remain within a state in such a way as to become a part of the property within the state. But when a plane lands to receive and discharge passengers, to undergo servicing or repairs, or to await a convenient departing schedule, it does not in my opinion lose its character as a plane in transit. Long ago this Court held that the landing of a ship within the ports of a state for similar purposes did not confer jurisdiction to tax. *Hays* v. *Pacific Mail S. S. Co.*, 17 How. 596; *St. Louis* v. *Ferry Co.*, 11 Wall. 423; *Morgan* v. *Parham*, 16 Wall. 471; cf. *Ayer & Lord Tie Co.* v. *Kentucky*, 202 U. S. 409. I cannot consider that to alight out of the skies onto a landing field and take off again into the air confers any greater taxing jurisdiction on a state than for a ship for the same purposes to come alongside a wharf on the water and get under way again.

What, then, remains as a basis for Minnesota's claim to tax this entire fleet of planes at their full value as property of the State of Minnesota? They have been within the state only transiently and in the same manner in which they have been in many states: to serve the public and to be serviced. The planes have received no "protection"

or "benefit" from Minnesota that they have not received from many others. It might be difficult, in view of the complete control of this type of activity by the Federal Government, to find what benefits or protection any state extends. But no distinction whatever can be pointed out between those extended by Minnesota and those extended by any state where there is a terminal or a stopping place.

But it is said that Minnesota incorporated the company. Of course it is her right to tax the company she has created and the franchise she has granted. I suppose there are many ways that she might constitutionally measure the value of this privilege. If she chartered a corporation on condition that all property it might acquire, tangible or intangible, should be taxable under her laws, I do not think a company which accepted such a charter could appeal to the Constitution to give back what it voluntarily contracted away. But no such stipulation has been made in the charter in this case. The tax imposed here is a general *ad valorem* property tax on the full value of every plane of the fleet operated by this company. Domicile of an owner is a usual test of power to tax intangibles, but has not generally been a conclusive test of taxability of tangible property situated elsewhere. If we should suppose that this corporation had a Delaware charter instead of a Minnesota one, and had nothing in Delaware except its agent, but operated otherwise in Minnesota exactly as it has done, would we say that the entire right to tax the fleet moved to Delaware because it was the corporation's state of domicile? I do not think that domicile, in the facts of this case, is decisive of Minnesota's claim to tax the tangible property of the company wherever situate.

It is strongly and plausibly advocated that the theory of apportionment of the total value among the several states of operation, heretofore applied to state taxation

of railroad rolling stock, be transferred to air transportation. This would mean that each state of operation (no one ventures to say whether flight alone or both flight and landing would be required) could tax a proportion of the total value.

The apportionment theory is a mongrel one, a cross between desire not to interfere with state taxation and desire at the same time not utterly to crush out interstate commerce. It is a practical, but rather illogical, device to prevent duplication of tax burdens on vehicles in transit. It is established in our decisions and has been found more or less workable with more or less arbitrary formulae of apportionment. Nothing either in theory or in practice commends it for transfer to air commerce. A state has a different relation to rolling stock of railroads than it has to airplanes. Rolling stock is useless without surface rights and continuous structures on every inch of land over which it operates. Surface rights the railroad has acquired from the state or under its law. There is a physical basis within the state for the taxation of rolling stock which is lacking in the case of airplanes.

It seems more than likely that no solution of the competition among states to tax this transportation agency can be devised by the judicial process without legislative help. The best analogy that I find in existing decisions is the "home port" theory applied to ships. See *Hays* v. *Pacific Mail S. S. Co., St. Louis* v. *Ferry Co., Morgan* v. *Parham, supra*. There is difficulty in the application of this doctrine to air commerce, I grant. There is no statutory machinery for fixing the home port. If federal registration established statehood as it establishes nationality, the home port doctrine would be easy to apply. However, on the record before us it seems unquestioned that Minnesota is in an operational as well as in a domiciliary sense the home port of this fleet. On that doctrine Minnesota can tax the fleet, but its right to do so is exclusive,

for no other state can acquire jurisdiction to tax merely because it provides a port of call. I therefore concur in the conclusion reached by the opinion of MR. JUSTICE FRANKFURTER. I do not accept the opinion because it falls short of commitment that Minnesota's right is exclusive of any similar right elsewhere. It is, I know, difficult to judge and dangerous to foreclose claims of other states that are not before us. That is the weakness of the judicial process in these tax questions where the total problem that faces an industry reaches us only in installments. If the reasoning should hereafter be extended to support full taxation everywhere, it would offend the commerce clause, as I see it, even more seriously than apportioned taxation everywhere.

The evils of local taxation of goods or vehicles in transit are not measured by the exaction of one locality alone, but by the aggregation of them. I certainly do not favor exemption of interstate commerce from its "just share of taxation." But history shows that fair judgment as to what exactions are just to the passer-by cannot be left to local opinion. When local authority is taxing its own, the taxed ones may be assumed to be able to protect themselves at the polls. No such sanction enforces fair dealing to the transient. In all ages and climes those who are settled in strategic localities have made the moving world pay dearly. This the commerce clause was designed to end in the United States.

The rule I suggest seems most consonant with the purposes of the commerce clause among those found in our precedents. But the whole problem we deal with is unprecedented. I do not think we can derive from decisional law a satisfactory adjustment of the conflicting needs of the nation for free air commerce and the natural desire of localities to have revenue from the business that goes on about them.

I concur in the affirmance of the judgment below, but only because the record seems to me to establish Minnesota as a "home port" within the meaning of the old and somewhat neglected but to me wise authorities cited.

MR. CHIEF JUSTICE STONE, dissenting:

In my opinion the Minnesota levy imposed an unconstitutional tax on petitioner's vehicles of interstate transportation in violation of the commerce clause, and for that reason the judgment below should be reversed.

Petitioner, a Minnesota corporation, is owner of a large number of airplanes which it uses exclusively in interstate transportation moving on regular schedules and over fixed routes extending through eight states between Chicago, Illinois, and the Pacific coast, with the usual landing fields and maintenance bases at intermediate points, including Minneapolis and St. Paul, Minnesota. It is stipulated that on May 1, 1939, 14% of the total mileage of the prescribed interstate routes was in Minnesota and that 16% of the daily plane mileage of all petitioner's interstate planes was in that state.

Although the Minnesota statute taxing personal property directs that it shall be listed for taxation on May 1st of each year and assessed for taxation at its value on that date, Minn. Stat. 1941 § 273.01, the state taxing authorities have levied on petitioner, and the Minnesota Supreme Court and this Court have sustained, an annual tax on the full value of all its planes used in interstate commerce which have come into the state at any time during the year. It is evident that if, with the Minnesota tax now sustained, other states are left free to impose a further or comparable tax on the same property for the same tax period, a serious question is raised whether the tax is not a prohibited burden on interstate commerce.

It is no longer doubted that interstate business "must pay its way" by sustaining its fair share of the property

tax burden which the states in which the interstate business is done may lawfully impose generally on property located within them. See *Western Live Stock* v. *Bureau,* 303 U. S. 250, 254–5 and cases cited. Obviously interstate business bears no undue part of that burden if the personal property tax imposed on it by a given state is—like a tax on real estate located there—exclusive of all other property taxes imposed by other states, as is the case with the taxation of vessels, *Old Dominion S. S. Co.* v. *Virginia,* 198 U. S. 299; *Southern Pacific Ry.* v. *Kentucky,* 222 U. S. 63 and cases cited; cf. *N. Y. Central & H. R. R. Co.* v. *Miller,* 202 U. S. 584, or if the tax on its personal property regularly used over fixed routes in interstate commerce, both within and without the taxing state, is fairly apportioned to its use within the state, as has until now been the rule as to railroad cars. *Marye* v. *Baltimore & Ohio R. Co.,* 127 U. S. 117, 123–4; *Pullman's Car Co.* v. *Pennsylvania,* 141 U. S. 18; *American Refrigerator Transit Co.* v. *Hall,* 174 U. S. 70; *Union Transit Co.* v. *Lynch,* 177 U. S. 149; *Union Transit Co.* v. *Kentucky,* 199 U. S. 194; *Germania Refining Co.* v. *Fuller,* 245 U. S. 632; *Union Tank Line Co.* v. *Wright,* 249 U. S. 275; *Johnson Oil Co.* v. *Oklahoma,* 290 U. S. 158.

If the tax levied here were held to be exclusive of all property taxes imposed on petitioner's airplanes by other states there could be no serious question of an undue burden on interstate commerce. That question arises now only because the rationale found necessary to support the present tax leaves other states free to impose comparable taxes on the same property used in interstate commerce which Minnesota has already taxed for the entire taxable year and at its full value.

Such, I think, is the necessary consequence of the Court's decision and judgment now given. They do not sustain the tax on the ground that Minnesota, as the state of petitioner's domicile, has exclusive power to tax respondent's

planes which pass in and out of Minnesota in performance of their interstate functions. They do not deny that the planes are constitutionally subject, to some extent, to personal property taxes by the states through which they pass. Our decisions, as will presently appear, establish that they are, and that vehicles of interstate transportation moving from the state of the owner's domicile over regular routes within the jurisdiction of other states also acquire a tax situs there, so that, to an extent presently to be considered, they may be taxed by each of the states through which they pass. In fact the record discloses that petitioner's interstate planes, already taxed by Minnesota for their full value, are in addition subjected to personal property taxes in six of the seven other states through which they fly.

But if petitioner's airplanes, which are taxable for some portion of their value in each of the states in which they carry on interstate transportation over fixed routes and regular schedules, are also taxed for their full value by Minnesota, the state of the domicile, it is evident that merely because they are engaged in interstate commerce they may be subjected to multiple state taxation far in excess of their value, and far beyond any tax which any one of the states concerned could under its established system of taxation impose on vehicles whose movements are confined within its territorial limits. It is a scheme of property taxation on which, so far as the decision now rendered gives us any hint, the commerce clause sets no restriction, but which is so burdensome in its operation as compared with the taxes imposed on intrastate vehicles that few interstate carriers could support it and survive economically.

The case thus sharply presents in a new form the old question whether the commerce clause affords any protection against multiple state taxation of the physical

facilities used in interstate transportation which, because they move from state to state, are exposed to full taxation in each, save only as the due process and commerce clauses may prevent. Although the question is new in form it is old in substance and this Court has considered it so often in other but similar relationships that the answer here seems plain.

Of controlling significance in this case are certain elementary propositions, so long accepted and applied by this Court that they cannot be said to be debatable here, although they seem not to have been taken into account in deciding this case either here or in the Minnesota Supreme Court. The first is that the constitutional basis for the state taxation of the airplanes, which are chattels, is their physical presence within the taxing state, and not the domicile of the owner. *Union Transit Co.* v. *Kentucky, supra; Johnson Oil Co.* v. *Oklahoma, supra,* 161–2 and cases cited. In this respect, as this Court has often pointed out, the taxation of chattels rests on a different basis than does the taxation of intangibles, which have no physical situs and may be reached by the tax gatherer only through exertion of the power of the state over the person of those who have some legal interest in the intangibles. *Union Transit Co.* v. *Kentucky, supra,* 205–6; *Schwab* v. *Richardson,* 263 U. S. 88, 92; *Frick* v. *Pennsylvania,* 268 U. S. 473, 494; *Blodgett* v. *Silberman,* 277 U. S. 1, 16–18; *Wheeling Steel Corp.* v. *Fox,* 298 U. S. 193, 209–10; *Curry* v. *McCanless,* 307 U. S. 357, 363–6; *Graves* v. *Elliott,* 307 U. S. 383; *Graves* v. *Schmidlapp,* 315 U. S. 657; *State Tax Comm'n* v. *Aldrich,* 316 U. S. 174.

A state may, within the Fourteenth Amendment, tax a chattel located within its limits, although its owner is domiciled elsewhere. *Brown* v. *Houston,* 114 U. S. 622; *Coe* v. *Errol,* 116 U. S. 517; *Pullman's Car Co.* v. *Pennsylvania, supra; Old Dominion S. S. Co.* v. *Virginia, supra.*

But due process precludes the state of the domicile from taxing it unless it is brought within that state's boundaries. *Delaware, L. & W. R. Co.* v. *Pennsylvania,* 198 U. S. 341; *Union Transit Co.* v. *Kentucky, supra; Frick* v. *Pennsylvania, supra,* 489 *et seq.* It is plain then that for present purposes, and so far as the Fourteenth Amendment is concerned, respondent's airplanes, which are chattels regularly moving over fixed interstate routes, are subject in some measure to the taxing power of every state in which they regularly stop on their interstate mission.[1]

In some instances it may be that vehicles of transportation moving interstate are so sporadically and irregularly present in other states that they acquire no tax situs there, *Hays* v. *Pacific Mail S. S. Co.,* 17 How. 596; *St. Louis* v. *Ferry Co.,* 11 Wall. 423; *Morgan* v. *Parham,* 16 Wall. 471; *Ayer & Lord Tie Co.* v. *Kentucky,* 202 U. S. 409, and hence remain taxable to their full value by the state of the domicile because they are not taxable elsewhere, *N. Y. Central & H. R. R. Co.* v. *Miller, supra; Southern Pacific Co.* v. *Kentucky, supra.* But that is not the case as to any of the planes here involved. And our decisions establish that, except in the case of tangibles which have nowhere acquired a tax situs based on physical presence, and for that reason remain taxable at the domicile even if never present there, the state's power to tax chattels depends

---

[1] We need not consider here whether the jurisdiction of a state over air above it—as distinguished from the control of a private landowner over air above his land—affords a basis for taxation of planes which regularly fly over the state but do not regularly land within its borders. For in six of the seven states, other than Minnesota, over which petitioner's airplanes regularly fly, they also make regular scheduled landings. Plainly those states have jurisdiction to tax a proportionate part of their value and to that extent the judgment of the Minnesota Supreme Court, permitting taxation in full by the domicile, is erroneous, and the cause should be remanded for further proceedings.

on their physical presence and is neither added to nor subtracted from because the taxing state may or may not happen to be the state of the owner's domicile.

We need not consider to what extent the due process clause limits the taxing power of each state through which airplanes or other vehicles of interstate transportation pass, to the taxation of part only of their value, fairly related to their use within the state, or precluded the Minnesota Supreme Court from extending to tangible property moving in more than one state the rule of *Curry* v. *McCanless, supra,* and subsequent cases, permitting full taxation of intangibles by each state having a substantial relationship to the interest taxed. For we are dealing here with tangible instrumentalities of interstate commerce, entitled as such to the protection afforded by the commerce clause from unduly burdensome state taxation, even though the tax might otherwise be within the constitutional power of the state. And it is plain, as this Court has often held, that if one state may impose a personal property tax at full value on an interstate carrier's vehicles of transportation, and other states through which they pass may also tax them for the same tax period, the resulting tax would be destructive of the commerce by imposing on it a multiple tax burden to which intrastate carriers are not subjected.

This Court has never denied the power of the several states to impose a property tax on vehicles used in interstate transportation in the taxing state. It has recognized, as we have seen, that such instruments of interstate transportation, at least if moving over fixed routes on regular schedules, may thus acquire a tax situs in every state through which they pass. And it has met the problem of burdensome multiple taxation by the several states through which such vehicles pass by recognizing that the due process clause or the commerce clause or both pre-

clude each state from imposing on the interstate commerce involved an undue or inequitable share of the tax burden. In *Nashville, C. & St. L. Ry.* v. *Browning,* 310 U. S. 362, 365, we recently considered "the guiding principles for adjustment of the state's right to secure its revenues and the nation's duty to protect interstate transportation." We declared that "The problem to be solved is what portion of an interstate organism may appropriately be attributed to each of the various states in which it functions." And, in sustaining the tax, apportioned according to mileage, upon the entire property, including rolling stock, of an interstate railroad, imposed by Tennessee, the state of the owner's domicile, in which its principal business office and over 70% of its trackage was located, we said that the state could not "use a fiscal formula . . . to project the taxing power of the state plainly beyond its borders."

This Court has accordingly held invalid state taxation of vehicles of interstate transportation unless the tax is equitably apportioned to the use of the vehicles within the state compared to their use without, whether the tax is laid by the state of the domicile or another.[2] Such an

---

[2] The rule, generally applied, that vessels are taxable only by the domicile, *Hays* v. *Pacific Mail S. S. Co.,* 17 How. 596, 597; *St. Louis* v. *Ferry Co.,* 11 Wall. 423, 430, 431–2; *Morgan* v. *Parham,* 16 Wall. 471, 475; *Transportation Co.* v. *Wheeling,* 99 U. S. 273, 279–80; *Ayer & Lord Tie Co.* v. *Kentucky,* 202 U. S. 409, 421; *Southern Pacific Co.* v. *Kentucky,* 222 U. S. 63, 68, 69, 77, is no exception to these rules. For vessels ordinarily move on the high seas, outside the jurisdiction of any state, and merely touch briefly at ports within a state. Hence they acquire no tax situs in any of the states at which they touch port, and are taxable by the domicile or not at all. See *Pullman's Car Co.* v. *Pennsylvania,* 141 U. S. 18, 23; *Southern Pacific Co.* v. *Kentucky, supra,* 75. The suggestion in the earlier cases, see *Hays* v. *Pacific Mail S. S. Co., supra,* 600; *St. Louis* v. *Ferry Co., supra; Morgan* v. *Parham, supra,* that vessels were to be taxed exclusively at the home port, whether or not it was the domicile, was rejected in *Ayer & Lord Tie Co.* v. *Kentucky, supra,* and *Southern*

apportionment has been sustained when made according to the mileage traveled within and without the state, *Pullman's Car Co.* v. *Pennsylvania, supra,* 26, or the average number of vehicles within the taxing state during the tax period. *Marye* v. *Baltimore & Ohio R. Co., supra; American Refrigerator Transit Co.* v. *Hall, supra,* 82; *Union Transit Co.* v. *Lynch, supra.*[3]

But if the tax is laid without apportionment or if the apportionment, when made, is plainly inequitable so as to bear unfairly on the commerce by compelling the carrier to pay to the taxing state more than its fair share of the tax measured by the full value of the property, this Court has set aside the tax as an unconstitutional burden on interstate commerce, whether it be in form on the rolling

---

*Pacific Co.* v. *Kentucky, supra,* and has never been revived. But where the vessels operate wholly on waters within one state, they have been held to be taxable there, *Old Dominion S. S. Co.* v. *Virginia,* 198 U. S. 299, and not at the domicile, *Southern Pacific Co.* v. *Kentucky, supra,* 67, 72, a result which, like the rule of apportionment in taxing railroad cars, avoids the burden of multiple taxation.

[3] Similarly taxes by the state of domicile or other states on the carrier's entire property including rolling stock have been sustained if apportioned according to mileage, *Pittsburgh, C., C. & St. L. Ry. Co.* v. *Backus,* 154 U. S. 421; *Adams Express Co.* v. *Ohio,* 165 U. S. 194, 166 U. S. 185; *American Express Co.* v. *Indiana,* 165 U. S. 255; *Adams Express Co.* v. *Kentucky,* 166 U. S. 171; *Wells, Fargo & Co.* v. *Nevada,* 248 U. S. 165; *St. Louis & E. St. L. Ry. Co.* v. *Hagerman,* 256 U. S. 314; *Southern Ry. Co.* v. *Watts,* 260 U. S. 519; *Nashville, C. & St. L. Ry.* v. *Browning,* 310 U. S. 362, or a combination of relevant factors, *Rowley* v. *Chicago & N. W. Ry. Co.,* 293 U. S. 102; *Great Northern Ry. Co.* v. *Weeks,* 297 U. S. 135. Likewise gross receipts taxes, if properly apportioned or otherwise limited to receipts from business done within the state, have been upheld, *Erie Ry. Co.* v. *Pennsylvania,* 21 Wall. 492; *Maine* v. *Grand Trunk Ry. Co.,* 142 U. S. 217, as explained in *Galveston, H. & S. A. Ry. Co.* v. *Texas,* 210 U. S. 217, 226; *United States Express Co.* v. *Minnesota,* 223 U. S. 335; *Cudahy Packing Co.* v. *Minnesota,* 246 U. S. 450; *Pullman Co.* v. *Richardson,* 261 U. S. 330; cf. *New York, L. E. & W. R. Co.* v. *Pennsylvania,* 158 U. S. 431.

stock, *Union Transit Co.* v. *Kentucky, supra; Union Tank Line Co.* v. *Wright, supra; Johnson Oil Co.* v. *Oklahoma, supra,* or on the carrier's entire property, *Fargo* v. *Hart,* 193 U. S. 490; or on a franchise or right to do business, *Allen* v. *Pullman's Car Co.,* 191 U. S. 171; *Wallace* v. *Hines,* 253 U. S. 66; *Southern Ry. Co.* v. *Kentucky,* 274 U. S. 76; cf. *Norfolk & Western R. Co.* v. *Pennsylvania,* 136 U. S. 114.

Upon like principles this Court has consistently held that a tax laid by a state on gross receipts from interstate commerce, which is comparable to a property tax at full value on vehicles of interstate transportation, violates the commerce clause unless equitably apportioned. *Galveston, H. & S. A. Ry. Co.* v. *Texas,* 210 U. S. 217; *Oklahoma* v. *Wells, Fargo & Co.,* 223 U. S. 298; see *Cudahy Packing Co.* v. *Minnesota,* 246 U. S. 450, 453–5; *Pullman Co.* v. *Richardson,* 261 U. S. 330, 338–9. To the same effect as to capital stock taxes, see *Atchison, T. & S. F. Ry. Co.* v. *O'Connor,* 223 U. S. 280, 285 and cases cited.

In many the tax was held invalid although imposed by the state of the domicile of the taxpayer. *Philadelphia & Southern S. S. Co.* v. *Pennsylvania,* 122 U. S. 326, 342, overruling *State Tax on Railway Gross Receipts,* 15 Wall. 284; *Crew Levick Co.* v. *Pennsylvania,* 245 U. S. 292; *New Jersey Telephone Co.* v. *Tax Board,* 280 U. S. 338; *Fisher's Blend Station* v. *Tax Commission,* 297 U. S. 650; *Puget Sound Co.* v. *Tax Commission,* 302 U. S. 90; *Adams Mfg. Co.* v. *Storen,* 304 U. S. 307; *Gwin, White & Prince* v. *Henneford,* 305 U. S. 434; see *Western Live Stock* v. *Bureau, supra.* The same rule is applied to the taxation by the domicile of goods carried interstate, *Case of the State Freight Tax,* 15 Wall. 232; *Eureka Pipe Line Co.* v. *Hallanan,* 257 U. S. 265; and the taxation of goods in transit generally, *Hughes Bros. Co.* v. *Minnesota,* 272 U. S. 469.

In *Galveston, H. & S. A. Ry. Co.* v. *Texas, supra,* 228, in which a tax on gross receipts of a railway engaged in interstate commerce was condemned because not apportioned, the Court declared, "Of course, it does not matter that the plaintiffs in error are domestic corporations." The like rule, applied to the taxation by the state of the owner's domicile of railroad property, including rolling stock, was approved in *Nashville, C. & St. L. Ry.* v. *Browning, supra.* And in *Bacon* v. *Illinois,* 227 U. S. 504, 511–12, the Court was at pains to point out that the power of a state to tax goods in transit is not affected by the fact that it is or is not the domicile of the owner. These cases clearly establish that, whatever relevance domicile may at times have to the power of a state under the due process clause to tax tangibles, it has none to the question whether the exercise of that power so burdens interstate commerce as to violate the commerce clause.

It cannot be said either in point of practicality or of legal theory that anything is added to Minnesota's power to tax by reason of the fact that all of petitioner's aircraft are registered with the Civil Aeronautics Authority with St. Paul, Minnesota, designated as their "home port." Section 501 of the Civil Aeronautics Act, 52 Stat. 1005, 49 U. S. C. § 521, requiring the registration with the Authority of aircraft, merely provides that a certificate of registration "shall be conclusive evidence of nationality for international purposes." Neither the statute nor the regulations adopted under it attach any other consequences to the registration of airplanes at a particular "home port." The much more detailed provisions of R. S. §§ 4141, 4178 as amended, requiring registration of vessels at a particular home port and the painting of the name of that port on the stern of the vessel, have been held irrelevant to state power to tax, even though the port of enrollment is also one at which the vessel regularly calls, *St.*

*Louis* v. *Ferry Co., supra; Ayer & Lord Tie Co.* v. *Kentucky, supra;* see *Southern Pacific Co.* v. *Kentucky, supra,* 68, 73.

Nor is it of any significance for tax purposes whether Minnesota is "as a business fact the home state of the fleet." While the existence of a business domicile has been thought to afford a basis for the state taxation of intangibles, on the theory that they have become localized there, *Wheeling Steel Corp.* v. *Fox, supra,* 211 *et seq.,* the constitutional bases for the taxation of tangibles and of intangibles are, as we have seen, quite different, and under our decisions, to which we have referred, the only basis for the taxation of tangibles is their physical presence in the taxing jurisdiction. And even the taxation of intangibles of interstate carriers is subject to the rule of apportionment wherever the tax without it would subject the commerce to the burden of multiple state taxation. The "unit rule" for the taxation of interstate carriers applies to tangibles and intangibles alike and requires an equitable apportionment of the tax on both. *Adams Express Co.* v. *Ohio,* 165 U. S. 194, 222, 226; 166 U. S. 185, 223–4, 225; *Fargo* v. *Hart, supra,* 499; *Oklahoma* v. *Wells Fargo & Co., supra,* 300; *Wallace* v. *Hines, supra,* 69–70; *Southern Ry. Co.* v. *Kentucky, supra,* 81.

Moreover, the difficulties of applying to aircraft a rule of taxation at a "home port" are essentially those which have led, long since, to the abandonment of the idea by this Court as applied to vessels. Compare *St. Louis* v. *Ferry Co., supra; Ayer & Lord Tie Co.* v. *Kentucky, supra.* While it appears from the present record that petitioner maintains at St. Paul, Minnesota, its airplane and engine overhauling base, at which the principal repairs to planes and engines are made, it also operates maintenance bases at Chicago, Illinois, Minneapolis, Minnesota, Fargo, North Dakota, Billings, Montana, and Spokane and Seattle,

Washington, at which points it maintains crews of mechanics and maintenance equipment. It owns and leases hangars and office space at all of its stopping points, each of which are manned by its employees. On the tax day, May 1, 1939, petitioner's planes made no scheduled stop in St. Paul. Thus a number of states have a physical relationship to petitioner's business—by reason of the movement of planes, over the fixed routes, the landing of planes, the maintenance and operation of repair and service equipment, landing fields, hangars, and office buildings, with their attendant employees—which, for practical purposes, is as substantial in nature as that claimed for Minnesota.

Even if we could say on this record that Minnesota and it alone can be regarded as the "home state," we have no assurance that in taxing planes operated by other and more complex business organizations, one state will have any greater claim to that designation than several others, and the Court's opinion furnishes no test to guide in the choice among them, if choice has any relevance. Nor does it say that the power to tax vehicles of interstate transportation at the domicile or the "home port" is exclusive. Obviously, unless it is deemed to be thus exclusive it does not foreclose any state within which the planes move on fixed routes from imposing a like tax burden. And if it is deemed to be exclusive the other states must be denied their just claims to collect an equitable tax on property regularly used within them in carrying on an interstate business. North Dakota, for instance, in taxing the planes regularly landing within its borders, is not taxing rights originating in and safeguarded by Minnesota, or exercising any rights attributable to Minnesota. No reason appears why North Dakota should be denied the right to tax the planes to the extent that they are within its borders, or why, to that extent, Minnesota

has any relationship to them sufficient either to enable it to tax them or to preclude North Dakota from taxing them.

The taxation of vehicles of interstate transportation in a business organized and conducted as is petitioner's is as capable of apportionment, and the insupportable multiple tax burden on interstate commerce is as readily avoided by apportionment of the tax, as in the case of the taxation of tangible and intangible property of railroads, railroad car supply companies, express companies, and the like which we have repeatedly held to be subject to the rule of apportionment. To refuse now to apply the rule of apportionment to petitioner's airplanes, after a half century of its application by this Court as the means of avoiding prohibited multiple state tax burdens on vehicles of interstate transportation; to extend to airplanes moving interstate over fixed routes on regular schedules, the rule that intangibles may be taxed at the business domicile whether or not taxed elsewhere; and to revive the abandoned doctrine that vessels may be taxed in full at their home port, while rejecting the correlative rule that they are exempt from taxation elsewhere, is to disregard the teachings of experience and of precedent. It subjects a new and important industry to state tax burdens, essentially discriminatory in their effect on interstate commerce, to which other interstate carriers are not subject and which it was the very purpose of the commerce clause to avoid.

Respondent places its reliance on *N. Y. Central & H. R. R. Co.* v. *Miller, supra.* There the Court sustained a franchise tax by the state of domicile including in its measure the full value of freight cars moving in and out of the state, often out of the taxpayer's possession for an indefinite time, and moving in the service of other roads on their independent business. The decision proceeded on the assumption, not tenable here but which the facts of that case were thought to support, that the cars were not

shown to have moved so regularly or continuously in any state or group of states outside the domicile as to gain a tax situs there. The Court in distinguishing the case from *Pullman's Car Co.* v. *Pennsylvania, supra,* which sustained a state tax on a foreign railroad corporation, measured by the intrastate mileage of cars passing in and out of the taxing state, said (pp. 597–8):

"But in that case it was found that the 'cars used in this State have, during all the time for which tax is charged, been running into, through and out of the State.' The same cars were continuously receiving the protection of the State and, therefore, it was just that the State should tax a proportion of them. Whether if the same amount of protection had been received in respect of constantly changing cars the same principle would have applied was not decided, and it is not necessary to decide now. In the present case, however, it does not appear that any specific cars or any average of cars was so continuously in any other State as to be taxable there. The absences relied on were not in the course of travel upon fixed routes but random excursions of casually chosen cars, determined by the varying orders of particular shippers and the arbitrary convenience of other roads. Therefore we need not consider either whether there is any necessary parallelism between liability elsewhere and immunity at home."

The present case raises the question which the *Miller* case found it unnecessary to decide but which this Court has consistently answered by requiring the apportionment of a tax on vehicles of interstate transportation according to their regular use within and without the taxing state. In the *Miller* case it appeared that the cars moved not only over the carrier's own tracks, but also were interchanged with other railroads, and thus, as the Court pointed out, moved about almost at random throughout the United States. No evidence was offered tending to show in what states the cars moved, or with what degree

of regularity they were present in any particular state or group of states other than New York. The Court was thus not called upon to consider whether New York could tax the cars if they moved between New York and other named states with such regularity that an "average of cars" could be said to be continuously so moving in those other states. Here, on the other hand, it is stipulated and found that all of petitioner's planes are "continuously engaged in flying from state to state in the course of [petitioner's] operations" and that those operations are on regular schedules along fixed routes through eight states. The total mileage of regular routes and the total daily mileage on those routes both in Minnesota and outside are definitely stipulated and found. Hence there is no warrant for saying that their presence in each of the states through which they pass is not as regular and continuous in nature as it is in Minnesota. These findings establish that, while no particular plane is permanently within any state, its planes are continuously flying in, and an average number or a percentage of the total is regularly, i. e., "permanently" within, each of the states through which they pass. Here, as was the case in *Pullman's Car Co.* v. *Pennsylvania, supra,* the same planes are "running into, through, and out of" each of the states along petitioner's routes and an "average" of planes is continuously within each of those states.[4]

---

[4] It is true that here there is no evidence of the average number of planes present within Minnesota or any other state during the tax year. But where the movement through the state is regular and continuous, as it is here and was not in the *Miller* case, apportionment may be made by showing the plane mileage or route mileage within and without the state. *Pullman's Car Co.* v. *Pennsylvania,* 141 U. S. 18; *Nashville, C. & St. L. Ry.* v. *Browning,* 310 U. S. 362, and cases cited. The Minnesota court here did not rest its decision on the ground that petitioner had sought to apportion by mileage instead of by average number of cars, and had introduced no evidence to support the latter type of apportionment. If it had it might well have

We are not now concerned with the proper apportionment of taxable values among the states outside the state of Minnesota. Since the movement of the planes, wherever they go, is over fixed routes and on regular schedules, they acquire a tax situs outside Minnesota to the extent that they do not move within it. Hence the extent to which they move in and are taxable by one state outside Minnesota rather than another is irrelevant. It is enough that the Minnesota tax is for full value and that Minnesota's fiscal formula imposes a prohibited burden on interstate commerce because it is used "to project the tax power of the state plainly beyond its borders," to reach instruments of interstate commerce which are taxable elsewhere, and that the extent of that projection may be measured by comparing either the plane or the

---

remanded the cause to permit any deficiencies of proof to be remedied. It held rather that regardless of the nature of proof of apportionment Minnesota, as the state of the domicile, could tax the cars for their entire value.

In this respect also the case is unlike the *Miller* case. There, as the record reveals, the carrier's evidence showed only the car mileage within and without the state, and its owned track mileage within and without the state. But since the cars moved over irregular routes without fixed schedules, car mileage afforded no basis of apportionment, without proof also that the cars were present in particular states with sufficient regularity to acquire a tax situs there. Owned track mileage likewise failed to afford a basis of apportionment, in the absence of some proof that the tracks were regularly used by the cars in question. Nor did the carrier lack opportunity to make fuller proof. The cause as it came here involved five successive tax years, as to each of which the carrier was afforded a hearing with opportunity to introduce evidence. The carrier having failed despite this repeated opportunity to introduce evidence which would, on any theory of apportionment, support a conclusion that any particular proportion of cars had acquired a tax situs elsewhere, this Court, as it pointed out, was not called upon to apply the rule of *Pullman's Car Co.* v. *Pennsylvania, supra,* or to consider whether, consistently with the commerce clause, property used as an instrumentality of commerce may be subjected to the risk of double taxation.

route mileage over fixed routes in Minnesota with like mileage over fixed routes in the states outside Minnesota.

Both before and since the *Miller* case this Court has ruled that vehicles of interstate transportation regularly moving to and from the state of domicile from and to other states acquire a tax situs in the latter, and that the state of domicile cannot constitutionally levy on them an unapportioned property tax. *Union Transit Co. v. Kentucky, supra; Johnson Oil Co. v. Oklahoma, supra; Nashville, C. & St. L. Ry. v. Browning, supra.* In *Johnson Oil Co. v. Oklahoma, supra,* 161–2, where the cars moved from and to Oklahoma to and from various states including Illinois, the state of domicile, we declared that the cars had acquired a tax situs outside Illinois and were to that extent not taxable by Illinois. The court rested its decision on the rule, stated without qualification, that "When a fleet of cars is habitually employed in several States—the individual cars constantly running in and out of each State—it cannot be said that any one of the States is entitled to tax the entire number of cars regardless of their use in other States." [5] Those cases should control

---

[5] In *Union Transit Co. v. Kentucky,* 199 U. S. 194, it appeared that the cars of the Transit Company, the taxpayer, moved in and out of Kentucky, the state of domicile. The Transit Company disclaimed on the record any effort to prove that it had any cars which never came within the state, and sought to establish the number "permanently located" outside it only by proof of gross earnings within and without the state. In holding that the state of domicile could not tax tangible personal property "permanently located in other states" (p. 201), it is clear that the Court was limiting the taxing power of the state of domicile to the extent that the cars moving between Kentucky and other states had, under the rule of apportionment, gained a tax situs outside the state because they were "located and employed" there (p. 211). This is evident from its citation (p. 206) of *Pullman's Car Co. v. Pennslyvania,* 141 U. S. 18, and *American Refrigerator Transit Co. v. Hall,* 174 U. S. 70, as cases involving property "permanently located" in the taxing states. Both cases in-

now. For here we are confronted with a scheme of taxation imposed on vehicles of interstate transportation located within the taxing state for only a limited and specified part of their active life. For the rest, they are in other states, moving over fixed routes of travel where, under our decisions, they plainly have a tax situs, and where they are in fact taxed in six of the seven states other than Minnesota through which they pass.

The tax now sustained is so obviously disproportionate to the protection afforded to the taxed property by the taxing state as to place a constitutionally intolerable burden on interstate commerce. But it is a burden which is capable of equitable adjustment which would satisfy constitutional requirements by the application of the principles of apportionment which this Court has repeatedly sanctioned, and which it is the constitutional duty of the State of Minnesota to apply. The application of these principles does not call for mathematical exactness nor for the rigid application of a particular formula; only if the resulting valuation is palpably excessive will it be set aside. But a reasonable attempt must be made to tax only so much of the value as is fairly related to use within the taxing state. *Union Tank Line Co.* v. *Wright, supra,* 282; *Great Northern Ry.* v. *Weeks, supra,* 144; *Nashville, C. & St. L. Ry.* v. *Browning, supra,* 365.

---

volved rolling stock continuously moving into and out of the taxing state and sustained taxes upon a proportion of the carrier's total rolling stock based respectively upon the track mileage or upon the average number of cars used within the taxing state. Had the Court intended to exempt, from the domicile's power to tax, only property which never came into the domicile it would have been necessary for it to discuss also the contention that the Union Transit Company had been denied the equal protection of the laws because railroads were taxed only upon the value of their rolling stock used within the state determined by the proportionate mileage within the state (pp. 202, 211).

It is no answer to suggest that the states other than Minnesota have not asserted their constitutional power to tax or that we do not know how or to what extent they have exercised it. The extent to which one state may constitutionally tax the instruments of interstate transportation does not depend on what other states may happen to do, but on what the taxing state has constitutional power to do. The jurisdiction of Minnesota to tax "must be determined on a basis which is consistent with the like jurisdiction of other States." *Johnson Oil Co.* v. *Oklahoma, supra,* 162. Minnesota cannot justify its imposition of an undue proportion of the total tax burden which can be imposed on an interstate carrier by saying that other states have taken or may take less than their share of the tax. It is enough that the tax exposes petitioner to "the risk of a multiple burden to which local commerce is not exposed," *Adams Mfg. Co.* v. *Storen, supra,* 311; *Gwin, White & Prince* v. *Henneford, supra,* 439, and cases cited. To hold otherwise would be to measure Minnesota's power to tax, not by constitutional standards, but by the action of other states over which neither Minnesota nor petitioner has any control and to leave petitioner's tax to be measured from year to year, not according to any legal standard, but by the unpredictable uncontrolled action of other states.

The judgment should be reversed and the case remanded for further proceedings in the course of which the state court would be free, if so advised, to inquire to what extent, if at all, the tax may, in harmony with state law, be apportioned in conformity to principles heretofore announced by this Court, and to that extent sustained.

Mr. Justice Roberts, Mr. Justice Reed, and Mr. Justice Rutledge join in this dissent.