**AMERICAN BARGE LINE CO. v. CAVE,
City Treasurer, and seven other cases.
Civil Action No. 1029.**

District Court, E. D. Louisiana,
New Orleans Division.
Sept. 5, 1946.

As Amended Sept. 13, 1946.

Arthur A. Moreno, of New Orleans, La., for plaintiffs.

Howard Lenfant, of New Orleans, La. for City of New Orleans.

Fred S. LeBlanc, Atty. Gen., and W. C. Perrault, Asst. to Atty. Gen., for State of Louisiana.

**32**

CAILLOUET, District Judge.

These eight suits were consolidated for the purpose of trial, the pleadings in each being, substantially, of the same general pattern.

Each one of the four plaintiffs in interest in said suits seeks to recover from the Commissioner of Public Finance and ex-officio Treasurer of the City of New Orleans, and from the State Tax Collector for the City of New Orleans, respectively, a stated sum of money paid, under protest, in settlement of claimed ad valorem taxes levied under assessments made by the Louisiana Tax Commission, upon and against certain watercraft of the plaintiff in interest; each such plaintiff, resisting payment, having availed itself of the provisions of the Act No. 330 of 1938, 6 Dart Louisiana General Statutes, §§ 8444.1–8444.3, and the sum paid, in each instance, having been duly segregated and being still so held, pending the outcome of the particular suit relating thereto.

The original defendant Commissioner of Public Finance and ex-officio City Treasurer, in four of said eight suits, having been succeeded in office by Lionel G. Ott, substitution was effected in due course, under the provisions of Rule 25(d) of the Federal Rules of Civil Procedure, 28 U.S. C.A. following section 723c, and each plaintiff now seeks judgment against said substituted officer, in lieu and in stead of Jess S. Cave, whose term of office has expired.

At the trial, the parties stipulated that the decision reached herein shall be controlling in like suits filed by the plaintiffs, respectively, relative to collected "taxes" of 1945.

In each suit, the plaintiff in interest contends that its corporate domicile is beyond the borders of the State of Louisiana and that none of its "taxed" property, all of which plaintiff operates in interstate commerce traffic upon navigable waters of the United States, has ever acquired a situs within this State.

It is uncontroverted that none of the watercraft of either the American Barge Line Company, DeBardeleben Coal Corporation, and Mississippi Valley Barge Line Company was ever physically present within Delaware, the State of their incorporation, but some, if not all, of the "taxed" property of the Union Barge Line Corporation was so present within Pennsylvania, under whose laws this particular plaintiff was created and enjoys corporate existence, as is made to appear by said plaintiff's amended complaint and the evidence.

The complaints all aver, substantially, that the assessment of plaintiffs' respective watercraft and marine equipment by the Louisiana Tax Commission was without authority of law because said tangible property had no tax situs within the State of Louisiana, having only repeatedly come into the State as occasion demanded while in interstate commerce movements, and for that purpose alone, and having remained in Louisiana only so long as such interstate commerce operations on the State's navigable waters made necessary.

Furthermore, plaintiffs allege that all such assessments so made by said Tax Commission were otherwise illegal in that they were predicated on a mileage basis, arrived at by assuming a certain number of miles to have been traveled by plaintiffs' respective watercraft during the tax year on the navigable waters of Louisiana and likewise assuming, by contrast, a certain mileage traveled by said marine equipment beyond the borders of the State, and then establishing, proportionately, the tax claimed to be due in Louisiana; said Tax Commission not having known, in any instance, the actual mileage traveled, nor having known whether or not all of the watercraft and marine equipment of the plaintiff in interest had come into the State of Louisiana during said tax year.

Plaintiffs also plead and urge that all such assessments were furthermore capricious and arbitrary, because they were actually made without knowledge of the value of any of the "taxed" property and rested solely upon the assumed existence of arbitrarily adopted values; and, finally, that the assessment and collection of the taxes, which plaintiffs now seek to recover, were and are unconstitutional, inasmuch as the same violate the 14th Amendment to the Constitution of the United

States, and Article 1, Section 2, of the Bill of Rights of the Constitution of Louisiana, by taking property without due process of law.

To all of which contentions, defendants make reply, substantially, as follows: The taxes collected impose no unconstitutional burden upon interstate commerce; their assessment and collection do not violate the constitutional requirement of due process; the Tax Commission's criticized manner of assessing was resorted to, because the plaintiffs arbitrarily withheld pertinent information from the Commission when requested by it to supply the same for the purposes of assessment; the method of assessment adopted was in compliance with the provisions of the amended Section 29 of Act 152 of 1932, 6 Dart Louisiana General Statutes, § 8370, which direct that "rolling stock or movable property of any railroad company, telegraph company, canal company or other transportation company, whose line lies partly within this state and partly within another state, or states, or whose sleeping cars run over any line lying partly within this state or partly within another state or states, shall be assessed in this state in the ratio which the number of miles of the line within the state has to the total number of miles of the entire lines."

Subsequent to the trial, the cause was re-opened upon joint request of the parties, for the purpose of admitting as evidence their written stipulation to the effect that:

"The Louisiana Tax Commission, in accordance with Louisiana law, preparatory to making an assessment on the water craft equipment of each of the plaintiff corporations, requested definite information from each corporation as to the number of their water craft, the value of each vessel, the total mileage travelled by said water craft in Louisiana waters during the taxable years in question, as compared to the total mileage traversed by said water craft during the said taxable years, and other pertinent information in connection therewith and in each case the plaintiff corporations refused to furnish this specific information, whereupon the Louisiana Tax Commission assessed, based upon the best information available to the said commission, as shown by the testimony of J. H. Cain, C. C. Zatarain, H. H. Huckaby, John H. Fetzer and Sidney J. Mann, the total valuation of the water craft owned by said plaintiff corporations and allotted to Louisiana a percentage thereof which the Louisiana Tax Commission believed to be the correct proportion of the mileage traversed by said water craft in Louisiana as compared to the mileage traversed over the entire water route of said plaintiff corporation."

Considering the stipulations entered into between the parties and the testimony adduced from witnesses at the trial (or produced thereat by depositions), as well as the documentary evidence forming part of the respective records, it is found that the paid taxes sought to be recovered are those relating to the years 1944 and 1945 except that, as to Union, the taxes involved are those of 1945.

The following other facts are likewise found, viz.:

(1) The American Barge Line Company, which will hereafter be referred to simply as American, while the names of the remaining three plaintiffs, for the like reason of brevity and convenience, will be written: Mississippi Valley, Union, and DeBardeleben, respectively, is, as previously stated, a Delaware corporation, and so are Mississippi Valley and DeBardeleben. None of the stockholders of either American or Mississippi Valley reside in Delaware, and the great majority of the DeBardeleben stockholders are likewise nonresidents thereof. None of the officers and directors of either of said three named corporations reside in Delaware, but the designated agent of each for the service of process in that State, Trust Corporation of Delaware, is there domiciled.

Union is a corporation organized and existing under the laws of Pennsylvania, with its domicile in the city of Pittsburgh, said State, where it maintains its principal business office.

Each of the four named corporations are lawfully engaged in transportation of freight upon inland waters of the United States, under authority of a certificate of

public necessity and convenience issued to each by the Interstate Commerce Commission.

■ The "taxed" towboats of American and DeBardeleben are enrolled under the United States shipping regulations pertaining to vessels engaged in domestic commerce (Title 46, Chap. 12, U.S.C.A.), at Wilmington, Delaware, and there, too, they have voluntarily registered their barges; while the towboats of Union are enrolled at Pittsburgh, and the watercraft of Mississippi Valley are enrolled at St. Louis, Missouri. But this has little or no bearing as concerns the place of taxation. 51 Am. Jur. (1944), § 913, pp. 807-809.

Under neither Delaware nor Pennsylvania law is such marine equipment as is used in interstate commerce by American, Mississippi Valley, DeBardeleben, and Union, respectively, subject to state taxation.

(2) The towboats of American regularly operate between Pittsburgh and New Orleans, and occasionally make a trip from St. Louis to New Orleans. Its barges ply on the Mississippi and Ohio Rivers, between Pittsburgh and New Orleans, and up the Cumberland, the Tennessee, the Monongahela and Kanawha Rivers; they operate, also, between Pittsburgh and Palmyra, Arkansas, and on the Intracoastal Canal.

Steel products originating in the Pittsburgh territory generally compose the downstream cargoes of American, whether destined for, say, Louisville, Kentucky, Memphis, Tennessee, New Orleans, on the Mississippi River, or Houston, Texas, on the Intracoastal Canal.

American has no warehouse at New Orleans, no stevedoring department, and operates no terminal there, as it does at Glassport, Pennsylvania, and at Louisville, and Memphis, respectively. In its operations beyond New Orleans, it transfers loaded barges to the motive power of like water transportation services.

All of its downstream tows it delivers to Whiteman's Landing, Algiers, on the west bank of the Mississippi, in New Orleans, and from this point leaves on all of its upstream return trips.

Cargo consigned to New Orleans is then transferred from Whiteman's Landing to city docks (at whatever space thereon indicated by the respective consignee) and there unloaded by Mississippi Valley, under an arrangement between it and American, but when a particular cargo is destined for a point beyond New Orleans, the carrying barge or barges are picked up at the Landing by a vessel making the Intracoastal Canal trip towards Houston, for instance, or, perhaps, by one proceeding further down the Mississippi to Port Sulphur or other nearby river point; none of which American owns or operates.

In the steady flow of interstate commerce so moved by American as far south as New Orleans several towboats and many barges are used. One towboat may start a trip from Pittsburgh only to be substituted by one or more towboats on the way south, and some or all of the loaded barges making up the initial tow may be delivered to consignees at intervening ports, such as Louisville, Memphis, and Palmyra, Arkansas, to be replaced by loaded barges there awaiting transportation downstream, so that no special towboat or barge is allocated to service on any particular leg of the voyage, and barges are made available as and where tonnage is offered for transportation. The tow load on any trip is always maintained, as nearly as practicable, of such number of barges and cargo weight as insures the towboat's pushing ahead at maximum efficiency.

All of the foregoing holds true, likewise, on return or upstream trips from New Orleans.

No towboat is permitted to remain in port any longer than is necessary to deliver cargo and to take on barges; at New Orleans, no longer than it takes to break up the downstream tow at Whiteman's Landing, and to then make up a tow for the return trip up the Mississippi.

There is sometimes a slight delay awaiting the delivery of loaded barges for the return trip, because seldom are empties towed upstream but some are sent down to New Orleans to load northward-bound tonnage offered. But consistent effort is made to expedite all return trips, inasmuch

as it is only by keeping the watercraft on the move that money is made, as American's acting superintendent of transportation expressed it in testifying.

Petroleum products, in the main, constitute American's upstream tows, although there are cargoes of alcohol and sugar. These cargoes are assembled at Whiteman's Landing, delivery being effected there from Texas and Louisiana points, for their inclusion in American's upstream operations.

American, by means of its wholly-owned subsidiary, Jeffersonville Boat and Machine Works, with plant located at Jeffersonville, Indiana, across the Ohio River from Louisville, Kentucky, where American maintains its chief business office, employing no less than 25 persons, does all general repair and overhaul work upon its marine equipment, but emergency repairs on a trip are necessarily done at the nearest boatways available.

In 1943 and 1944 American maintained a constant heavy traffic to and from New Orleans. It owned slightly less than 200 barges and 10 towboats, 9 of which were kept in operation, but 4 of them never came to New Orleans, and neither did some of its barges, but others did come rather constantly. In 1944 American added under charter from the Defense Plant Corporation 4 towboats and 40 barges to its marine equipment so being used in interstate commerce.

In 1943, American's total tonnage loaded and unloaded at various ports of call was 977,705.57 tons, 72,504.61 of which were loaded on at New Orleans, and 33,647.77 unloaded. In addition to this, there were assembled at Whiteman's Landing for American's upstream tows 18,732.63 tons, loaded at two points south of New Orleans, and 120,973.62 tons loaded at Intracoastal Canal points all the way to Houston, Texas. The total loadings leaving New Orleans in American's upstream traffic aggregated, therefore, 212,210.86 tons of the total tonnage transported in 1943, or about 22% thereof. The actual loadings at New Orleans approximated 7%. (Exhibit No. 5.)

Of the total time covered by their interstate commerce operations of 1943, American's towboats spent no more than approximately 3.8% thereof within the boundaries of Louisiana.

Only five of its own towboats moved in and out of the State, to which must be added the Java Sea, taken over, under charter, on November 24, 1943.

The schedule of time spent at the Port of New Orleans by American's said five vessels during that year shows the following state of facts, viz.:

The "Jefferson" was in one or more Louisiana ports, in all months except February and April, for a total of 33 days, 7 hours, and 45 minutes, 24 days, 7 hours, and 30 minutes of which were spent in making repairs, leaving 9 hours and 15 minutes for the vessel's usual activities such as dropping and picking up barges, taking on supplies, water, fuel, pumping out barges, etc.

The "National," in 6 months, i. e., April, June, August, September, October and November, for 9 days, 3 hours, and 15 minutes – 4 days, 4 hours, and 45 minutes thereof in making repairs; thus leaving but 4 days, 22 hours and 30 minutes for all other purposes.

The "Patriot" in 6 months, i. e., April, May, June, July, August and September, for 11 days, 10 hours, and 15 minutes – 7 days, 23 hours, and 15 minutes thereof in making repairs; leaving 3 days and 11 hours for all other purposes.

The "Pioneer," in each of the 12 months, for 49 days, 7 hours, and 5 minutes – 24 days, 13 hours, and 45 minutes in making repairs; leaving 24 days, 17 hours, and 20 minutes for all other purposes.

The "Progress," in 8 months, i. e., February, March, April, June, July, October, November and December, for 22 days, 3 hours, and 15 minutes – 15 days, 18 hours and 10 minutes thereof in making repairs; leaving 6 days, 9 hours and 5 minutes for all other purposes.

In 1944, American made 73 such "in and out" trips, having chartered four more Defense Plant Corporation power vessels,

and some forty odd barges, for use in its interstate commerce transportation service.

While in port at New Orleans, American's marine equipment has the benefit of such fire protection as is afforded all wharves, whether publicly operated at dock charges or privately maintained upon leased banks, and all watercraft moored to any of said wharves; as well as of harbor police surveillance, and of all sanitary regulations of State and City Boards of Health; but this presents no more favorable situation, so far as concerns American's interests, than exists in all like river ports which it serves, except that the Dock Board does operate two fire tugs, one of which helped to quench a fire on the towboat "Pioneer," in 1943, when the whole of that vessel's galley burned; which necessitated the vessel's remaining in port for 24 days thereafter, in order to effect the galley's replacement before commencement of the usual journey with a tow.

The same benefits are likewise shared by Mississippi Valley, Union and DeBardeleben, to greater or lesser degree, dependent upon their movements in and about the Port of New Orleans.

American never engages in Louisiana intrastate commerce operations; nor do Mississippi Valley and Union; but DeBardeleben does, although in a minor way.

(3) Mississippi Valley owns 80 barges and 4 towboats, i. e., the Ohio, Indiana, Tennessee, and the Louisiana, with which it ordinarily carries on its interstate commerce transportation as public carrier, but as increased volume of tonnage is offered at times, or in other like contingencies, temporarily chartered towboats and barges are added to the working fleet. Considering the overall period, an average of 2 to 3 towboats were so chartered and operated in 1943, and, in like manner, barges to the number of slightly less than the 80 barges owned.

No fixed number of barges or towboats, nor particular barges or boats, as such, are ever allocated to any special area within the territory covered by Mississippi Valley's water transportation operations, which begin at Pittsburgh, on the east, at St. Louis, on the west, and continue downstream to New Orleans, serving all intervening ports, including Cincinnati, Ohio, Evansville, Indiana, Louisville, Kentucky, Cairo, Illinois, Memphis, Tennessee, Vicksburg, Mississippi, and Baton Rouge, Louisiana.

Besides maintaining this regular water transportation service, Mississippi Valley also operates, on occasion, as far north as Minneapolis and on some of the tributaries of the upper Mississippi.

Usually, such barges as are unloaded at any point of discharge are loaded at once with cargo offered for transportation, to be picked up by the next upstream or downstream tow passing by; but when it is known in advance that surplus tonnage awaits transportation on an outbound trip, all available extra equipment is dispatched to that particular terminal. Whenever empties are on hand because of lack of cargo offered, and a passing tow is sufficiently light to profitably haul the barges to other points in need of them, they are so transferred; this is done, for instance, whenever movement of cargo into New Orleans, for any period, consistently exceeds the quantity carried out on return trips northward. Depending upon the season of the year, this process is reversed, at times.

Simply stated, boats and barges are supplied to move cargo whenever offered—no particular towboat or barge—the quantity and kind of cargo involved indicating, however, whether large or small barges, or open or closed barges, are needed.

The sole and only purpose of Mississippi Valley's watercraft coming into Louisiana, past Baton Rouge into New Orleans, from which terminal point such towboats and barges return northward, is to deliver cargo carried in interstate commerce from out of Louisiana to Louisiana points north of New Orleans, and to the Port of New Orleans. A constant water transportation service is maintained and in 1943—as it has been in all of the past several years—Mississippi Valley tows arrived at New Orleans once a week or oftener. No barges are ever picked up at Baton Rouge or other Louisiana point for delivery to New Orleans, nor at New Orleans, for any Louisiana port. Loaded barges in a down-

stream tow are dropped at Baton Rouge, where they remain until unloaded and picked up loaded or empty on the next succeeding return trip northward. Occasionally, as required for loading surplus tonnage offered, empties are dropped at Baton Rouge. No towboat remains at that port any longer than is necessary to tie off or pick up a barge.

Mississippi Valley's towboats do not travel the same route with regularity and, for instance, during a given period one or more of the boats may not come down the Mississippi as far as New Orleans, while one or more are repeating trips to the port without interruption; and barges made up in a tow, either at Pittsburgh or St. Louis, may all be dropped at intervening river points, as other loaded barges are picked up to replace them, so that the delivered tow at New Orleans may be one that has been wholly made up en route and is being pushed by other than the boat that started out on the downstream towing trip.

It is the constant aim of Mississippi Valley to unload cargo at point of destination without delay and to immediately re-load the emptied barge with available outbound cargo, so that the same may leave port on the first return trip if the loading is complete, or no later than the second, if not. When a tow reaches New Orleans, or other like terminus, the inbound tow is tied off in two units, the towboat takes on fuel, picks up the loaded outbound tow which awaited its coming, and immediately proceeds out of port. On occasion, however, because of limited cargo offerings, there may be delay in making up a full tow, consequently retarding the outbound trip.

But the ordinary maximum period that any towboat remains in the port of New Orleans is 12 to 48 hours, depending upon whether or not it is in need of emergency repairs. Every possible effort is made to keep the company's watercraft on the move for the greatest number of days a year inasmuch as it earns nothing when tied up. No equipment is ever laid up at any port except for temporary repairs or while awaiting outbound cargo, if not moved to another port where it is known to be more needed. At New Orleans, unless early need of an empty barge is anticipated, the same is moved to another point in order to avoid accruing wharfage; and empties are moved, at times, all the way from New Orleans to Cincinnati, or in reverse direction, depending upon how the bulk of water traffic is moving at the particular season of the year. Whenever there is no need of a particular boat or barge—necessitating its being laid-up—the vessel in question is usually tied up in Mississippi Valley's fleet at Cincinnati.

It may here be observed that, according to the evidence, the usual round-trip voyage between Cincinnati and New Orleans consumes thirty-five days.

Mississippi Valley operates a general repair shop at Cincinnati, where its boats and barges are ordinarily repaired and overhauled, except that, as a matter of course, running or emergency repairs are made wherever they are found necessary; and because Cincinnati has no drydock facilities whatever, as have Pittsburgh, St. Louis and New Orleans, whenever there is need of putting a vessel in drydock to make repairs, the same is done where the facilities therefor are more readily available, but mainly at New Orleans or Pittsburgh.

At New Orleans, Mississippi Valley employs a maintenance man who looks after the making of all necessary temporary repairs. Those are only such as must be made to enable the affected equipment to move out of the port. If repairs are needed but the trip to Cincinnati may, nevertheless, be safely undertaken, repairing is delayed until that port is reached.

At Cincinnati, St. Louis, Cairo, Memphis, and New Orleans, Mississippi Valley maintains its own terminals where it discharges and takes on cargo. At other points, such as Baton Rouge, Vicksburg, Louisville, Evansville, and Pittsburgh, it makes use of public terminal facilities.

New Orleans, inasmuch as it is a port through which is shipped freight in foreign trade—of which there was considerable in 1943 and 1944 because of war conditions— receives the greatest volume of Mississippi Valley's tonnage. A portion of the same is destined for New Orleans consignees, a part is loaded on oceangoing vessels, and

some of its loaded barges are transferred to other motive power in uninterrupted towing operations westward by connecting lines, through the Intracoastal Canal, to points of destination in Louisiana or Texas.

Nevertheless, Mississippi Valley's "taxed" marine equipment rested in the port of New Orleans no more—of the total time possible—than as follows, viz.: In 1943, the four towboats, an aggregate of approximately 17.25%, and the barges, an aggregate of approximately 12.7%. In 1944, by contrast, the towboats, approximately 10.2%, and the barges, approximately 17.5%.

Mississippi Valley's terminal facilities at New Orleans have been located, for the past 15 years, on the Industrial Canal at the Galvez Street wharf, where it occupies dock space, four hundred feet in width, allocated to it by the Dock Board, on a preferential basis, but this does not mean that its occupancy is exclusive since the Board may assign, in emergencies, part of such space to others; as has been done on occasions when unoccupied areas were available for such assignment. The company maintains its dock office there, in its own structure, and the necessary tractors, trailers, derricks and cranes for loading and unloading of cargo; and maintains, also, a "business solicitation" office in downtown New Orleans; seven or eight persons being employed at the dock office, and four at the other.

In St. Louis, Mississippi Valley conducts its home, or main, office which is staffed by fifty persons. Both there and at New Orleans, the company has other employees —dock laborers, hired by the hour to load and unload cargo, although a few are employed by the month at fixed salaries. The stevedoring operations at St. Louis, Cincinnati and New Orleans are substantially similar in size and character, although more dock laborers are employed at New Orleans.

(4) Union owns nine towboats and one hundred and twenty-two barges, which it employs in its interstate commerce operations as a water carrier, duly authorized by the Interstate Commerce Commission to ply certain portions of the Mississippi River system, including the Allegheny, Monongahela, Kanawha and Ohio Rivers, and the Mississippi from St. Louis to the Gulf of Mexico, as well as the Intracoastal Canal, west of New Orleans to Houston and Corpus Christi, Texas. In 1914, in addition to the advantage which normally enures to it by reason of a standing agreement existent between it and other water carriers, for mutual interchange of towing, Union found it necessary to make use of two chartered towboats and many barges as such common carrier of waterborne freight.

No one or more towboats or barges are dedicated to use on any particular section of the inland water system traveled. The flow of traffic normally controls and directs assignment of towboat or barge to service. When a shipper, for example, requires a barge, a suitable one, depending upon the kind of cargo offered, is supplied and, after the loaded cargo has been towed and delivered to the shipper's point of destination, the barge may be re-loaded there and either wends its way back or proceeds further on, in continued movement of cargo, or it may be towed as an empty to any other port where there is need of it for loading other freight offerings.

In its traffic from Pennsylvania to Louisiana, the principal commodities towed are manufactured steel products, etc., while the outbound freight from Louisiana is, in the main, petroleum products.

All of Union's downstream tows into Louisiana break up at New Orleans, but such barges as carry cargo intended for Texas ports are at once shifted to the motive power of towboats operated by barge lines that ply the Intracoastal Canal.

The bulk of Union's downstream freight originates in the Pittsburgh district, but it picks up cargo as it delivers, at intervening points, and the tow that finally comes to a halt at New Orleans may contain no barge that was once comprised in an original tow made up at Pittsburgh, but only such as were picked up in the tow's progress downstream, by way of replacing those consigned to intervening river points.

The ratio of Union's northbound traffic out of Louisiana to its southbound, is as of 3 to 1, the greater part of the outbound cargoes originating not out of New Orleans, but out of Baton Rouge. The time consumed in making a turn-around trip from Pittsburgh to New Orleans is from thirty-five to forty days. A towboat, of necessity, usually stays longer in Pittsburgh than any barge, between trips, for the reason that running repair and maintenance work is done in that port and due consideration must be given to the time-off-requirements of the crew.

Union operates neither terminal nor office at New Orleans, but has a working arrangement with other barge lines operating in and out of the port by which it assures the movement of its barges, and their tieing-up, whenever found necessary. It maintains no employees within the State of Louisiana, except that it does avail itself, for a money consideration, of the services of a shipping agent and importer, on occasion, in the manner and to the extent by it specially directed.

Arriving at Union's southern terminus, an inbound shipment of cargo is delivered in carrying barge to such New Orleans wharf as has been specified by the shipper, where barge and cargo are left at the responsibility of the consignee, to be by him unloaded at his or the shipper's expense. When discharge of cargo is effected, the consignee notifies Union, which then seeks to effect prompt removal from the dock.

No towboats or barges are permitted to ever remain in port any longer than is necessary, Union's constant endeavor being to maintain the equipment at the maximum cargo ton mile performance, since it is uneconomical to have its barges lying idle, be it in Louisiana port or any other.

No loaded barge transferred to Union's motive power at New Orleans for northward towing, by any barge line operating out of Texas through the Intracoastal Canal, stays in port any longer than necessary to effect transfer, and, so soon as it is incorporated in a Union tow, it moves up the Mississippi.

All repairs are usually done at Pittsburgh. In New Orleans, Union maintains neither yard nor other repair facilities and equipment. Whenever emergency repairs are needed on either towboat or barge, the same is effected at the nearest available plant.

Of Union's nine towboats, two did not enter Louisiana in 1944, and three of the seven that did, i.e. the Sam Craig, C. W. Talbot, and J. D. Ayres, each came in but twice, for aggregate stays in the port of New Orleans of 70½, 62 and 57½ hours, respectively, and in other Louisiana ports, of 73, 11 and 7½ hours, respectively, in the order named. A fourth, i.e., the Neville, entered three times, for aggregate stays in New Orleans of 99½ hours and in other Louisiana ports of 66 hours. The remaining three, i.e., the Peace, William Penn, and Jason, each came into the State seven times, for aggregate stays in the port of New Orleans of 203, 195 and 137 hours, respectively, and in other Louisiana ports, of 52, 224½ and 517½ hours, respectively, in the order named.

Thirty-eight of the cargo-carrying barges and one fuel flat owned and operated by Union did not find their way into Louisiana during 1944.

Of the total 8784 hours of 1944, 97.8% were spent by Union's towboats outside of Louisiana ports, 95.7% were similarly spent by its cargo barges, and 98% by its fuel flats, which last are used for carrying along the towboat's required fuel on a long-distance trip, if, as a matter of fact, a particular vessel is not provided with sufficient storage space aboard.

Union's home office is at Pittsburgh, and all of its officers are residents of Pennsylvania, within what is referred to as the Pittsburgh district.

(5) DeBardeleben owns and operates, or it did in 1943 and 1944, the following watercraft, viz.: Two tugs, i.e. the C. F. DeBardeleben and the Coyle, eighteen cargo barges, one derrick barge, one fuel barge, one wharf barge, and one collier. The last four vessels never left the Port of New Orleans, and were, admittedly, properly taxed in Louisiana, their undoubt-

ed tax situs; and eight of the cargo barges have been exclusively engaged in the transportation of its own coal from Coyle to Holt, in the State of Alabama, on the Warrior River, and were never in Louisiana during the claimed "taxable" years; they were, at all times, moved about by chartered motive power, neither of De-Bardeleben's tugs being available for that purpose.

The two tugs and the remaining ten barges, together with no less than eight additional tugs and many barges which De-Bardeleben chartered during 1943 and 1944, carried on a continuous interstate commerce traffic between New Orleans and Texas ports on the west, such as Houston, Galveston and Corpus Christi, and Alabama and Florida ports on the east, such as Mobile, Pensacola, Panama City and Carrabelle, and a relatively minor intrastate commerce, within Louisiana; and did make occasional trips up the Mississippi, with or without tows, at times as far up as Helena, Arkansas, and at others, only to Vicksburg or Natchez, Mississippi; and, also, did tow certain drydocks to U. S. Navy convoys anchored 30 miles offshore in the Gulf of Mexico, via the Atchafalaya River gateway to the Gulf, in the vicinity of Morgan City.

DeBardeleben's operations are carried on within the framework of five business divisions, i.e. Coal Mining, By-Products, Retail Division, Bunker Coal Division, and Marine Division. It mines coal at Coyle, Alabama, situated about 35 miles from Birmingham, and its by-products, or coke, operations are conducted at Holt, six miles or so from Tuscaloosa, Alabama. As previously stated, both Coyle and Holt are on the Warrior River, and so is the Port of Birmingham, which lies between them, distant 14 miles from the City of Birmingham.

The greater part of DeBardeleben's operations as a retail division was, until recently, conducted in and from New Orleans, and the bunker coal division operates in Louisiana, as well as in Mobile, and Pensacola, and, until a few years ago, it operated, also, in Galveston, Texas.

The marine division carries on DeBardeleben's interstate and intrastate commerce traffic under the name of the Coyle Lines, for the following reasons, viz.:—Coyle Lines was developed upon the basis of the previously-established world-wide business reputation of W. C. Coyle & Company, which came into being in 1865, and conducted a marine terminal and the movement of watercraft within the harbor at New Orleans from that time until 1934, when in a small way, it began first to operate, also, as a towing concern, upon the Gulf Intracoastal waterway. When DeBardeleben, in 1937, took over the property and established operations of the aforementioned Coyle Company, including its terminal at New Orleans, on the west, or Algiers, bank of the Mississippi River, the Coyle water traffic operations, which had gradually expanded since 1934, together with the Coyle terminal business were both continued under the name of Coyle Lines.

The Coyle terminal, as formerly established and still existing, is located on an area of 1800 to 2500 feet of water frontage, opposite Canal Street on the east bank of the Mississippi, and comprises piling clusters, docks and wharves, storage building and business office, and affords all necessary facilities for the handling and mooring of watercraft. The terminal is regularly made use of by Coyle Lines, and by other water transportation lines, including American, Mississippi Valley, Union, and the like, for the handling or tieing up of barges in New Orleans harbor, down-the-river tows coming in to the port, pull up at Coyle Terminal and their barges are then handled by DeBardeleben's marine division, which either delivers them to New Orleans docks for unloading, or, tows them to final destination if they are consigned to Intracoastal Canal points, whether westward or eastward of New Orleans.

In 1943 and 1944 the shore personnel employed at the Coyle Terminal, including day and night shifts, numbered 12 to 14 men, and their duties were to keep watch over the fleet of watercraft tied-up, operate the derrick, maintain the premises in order, etc., while the office personnel amounted to

approximately 20 persons. The New Orleans office is the largest one of the several that DeBardeleben maintains—one at Birmingham, Alabama, being known as the official home office. Its other offices are: One at Houston, Texas, employing 8 persons, and one at Mobile, Alabama, with but 2 employees.

The New Orleans office is the principal office of the marine division; it is there that its records are kept.

The ownership of Coyle Terminal is, of course, of material assistance in the operation of the Coyle Lines as water carrier of freight, but the respective operations are distinct and the Terminal facilities could continue in business without Coyle Lines common carrier activity, and that business likewise without the Terminal, if like terminal facilities were otherwise available to said Coyle Lines; which, also, could satisfactorily operate as a common carrier owning its own terminal facilities for the carrying on of its traffic, with far less river frontage than that presently owned and occupied by said Coyle Lines, and with a smaller force of shore and office personnel.

Modern and capacious dock and terminal facilities at Mobile, Alabama, are leased by DeBardeleben from the Federal Barge Line, and it owns a half interest in a corporation known as Bolivar Terminals, which operates a terminal, that DeBardeleben makes use of, at Bolivar, Texas, across from Galveston.

At New Orleans, but at no other port, DeBardeleben owns and operates a machine shop and repair facilities for the making of all usual ordinary repairs as are required by the tugs and barges that it operates and the general rule is to have such repairing and maintenance work done at New Orleans under the supervision of the Marine Superintendent of the Coyle Lines, with emergency repairs, as may become necessary en route, arranged for at the nearest available boat plant or yard. On relatively rare occasions, however, ordinary repairs are made at Houston or Galveston, as, for instance, to barges temporarily laid up in port, awaiting cargo.

Such repairs as are ordinarily done at New Orleans, and the usual fueling of the tugs as well as the regular payment of the crews which take place in that port only, all occur within the 24 hour lay-up period or shore leave stipulated for each work period of at least six consecutive days consumed in the making of a towing trip, in and by the existent Union agreement relating to the employment of the Coyle Lines' boat crews.

All Coyle tows, whether making round trips from and to New Orleans, or as done on some occasions, running through the port to points beyond New Orleans, never fail to pull up at Coyle Terminal as they enter the port. Whenever any round trip back to New Orleans has been of at least six days' duration, the accrued 24 hours' shore leave is taken at New Orleans, or if, because of business need, as, for instance, when a shipment is running late or is urgently needed, or because of labor purposes, Coyle Lines, at any time require continued towing operations (as it may do within its discretion, but for no longer than the maximum of three consecutive six-day work periods), then, as much as an aggregate of 72 hours' shore leave may be permitted to accumulate, to be thereupon accorded the crew at one time.

None of the 10 DeBardeleben barges that ply in interstate and intrastate commerce through and from and to the Port of New Orleans, and Texas ports to the westward as well as Alabama and Florida ports to the east, is specially allocated to the service of any one locality or to the carrying of a particular kind of cargo, except to the extent that a special type of barge is required on occasion for the proper loading and towing of the cargo offered. The barges are shifted about from one port to the other as the needs and convenience of the Coyle Lines demand, but each of said ten barges has New Orleans as its "home" port, to all intents and purposes, from which the barges first slip into the moving stream of traffic and are thereafter shunted about and shuttled back and forth between shipping points. And whenever a barge finds its way back through the port of New Orleans, it customarily comes to rest there for 24 hours, at least, while the tow's crew enjoys shore leave, the tug takes on fuel, the crew are paid their wages, and needed

"voyage" repairs to the watercraft are made.

During 1943 and 1944 the Coyle Lines moved the maximum amount of freight that it was capable of handling with its chartered equipment and the two tugs and ten barges of its own, in carrying on its main water transportation operations between Corpus Christi, Texas, as western terminus, and Carrabelle, Florida, as the eastern.

At all times the Lines' working equipment is kept moving in and out of any port entered so long as cargo is available, and whenever there is prospect of none at an early date, then the unloaded and empty barges are towed on to whatever other shipping point offers a load which, otherwise, can not be accepted, and since relatively very few loadings originate from the eastern end of the Intracoastal Canal route, the greatest number of barges used in any tow destined for points east of New Orleans, are towed back to that port as empties.

During 1943, the tug Coyle was in the Port of New Orleans each month, for intermittent stays totaling 34 in number, and consuming, respectively, from the minimum of 1 hour up to as much as 107, 119, and the maximum of 132½, hours—an average staying-time of approximately 47 hours on each occasion.

The percentage of time so spent, of the total number of hours during the year, was 18%, but considering that the crew's shore leave of 24 hours was customarily taken at New Orleans, and making due allowance therefor, it is concluded that the tug in question spent at least 11% of the 1943 total time within the Port of New Orleans.

Similarly, the tug C. F. DeBardeleben did not fail to be in New Orleans each month of 1943, its intermittent stays within the port totaling 51 and consuming, respectively, from the minimum of 1 hour up to as much as 102, 126, 146, 203, 210, and the maximum of 290, hours—an average staying-time of approximately 48 hours on each occasion.

The percentage of time so spent, of the total 1943 period, was 28%; which is, however, reduced to 19%, for the same reason

hereinabove stated to be applicable as to the tug Coyle.

The 1944 operations of both tugs approximately duplicated their 1943 movements in and out of New Orleans. Substantially a like situation developed with respect to the movement of the ten DeBardeleben barges, and plaintiff's compiled record (Exhibit 1) of the time spent in New Orleans by its watercraft in 1943, shows that the said ten barges, which were shifted about as ever-changing units of tows by the Coyle Lines' tugs within the operating area of said Line, were in New Orleans as follows, viz.:

(a) Two of them, each of the twelve months of the year; the first, for a total of 2247½ hours in an aggregate of 30 days wholly or partly spent in port, and the second, for a total of 2758½ hours in an aggregate of 19 days; or 26% and 31%, respectively, of the total number of hours during the year.

(b) Three of them, each one of eleven months; the first, for a total of 3412½ hours in an aggregate of 25 days wholly or partly spent in port; the second, for a total of 3276½ hours in an aggregate of 22 days; and the third, for a total of 1865 hours, in an aggregate of 18 days; or 39%, 37% and 21%, respectively, of the total number of hours during the year.

(c) One, each one of ten months, for a total of 1637½ hours in an aggregate of 23 days wholly or partly spent in port; or 19% of said total number of hours during the year.

(d) Three, each one of nine months; the first, for a total of 2069½ hours in an aggregate of 20 days wholly or partly spent in port; the second, for a total of 3320 hours in an aggregate of 11 days; and the third, for a total of 2653½ hours in an aggregate of 10 days; or 24%, 38%, and 30%, respectively, of the total number of hours during the year.

(e) One, each of three of the ten first months of the year that it was owned by DeBardeleben (sold in October, because of its having been damaged in traffic), for a total of 1322 hours in an aggregate of 9 days wholly or partly spent in port; or

18% of the total number of hours during said ten months period.

The average percentage of yearly time spent within the Port of New Orleans, during 1943, by the ten DeBardeleben barges so engaged in interstate commerce and in intrastate commerce within Louisiana was, therefore, no less than 28%.

As has already been observed, neither De-Bardeleben, American, Mississippi Valley, nor Union, is a Louisiana corporation, Delaware being the State that gave the first three "the power to be as well as the power to function," while Pennsylvania stands in like relation to Union.

No part of the taxed watercraft and marine equipment of the three was within Delaware, corporate domicile of each, at any time; but Union's like movable property was located in Pennsylvania, from and to which State it was continuously operated in interstate commerce during the years 1944 and 1945.

In none of the cases under consideration can either the State of Louisiana or the City of New Orleans successfully maintain the claimed right to tax any of the movable property in question unless it be established by the evidence that such property has acquired an actual situs for taxation within the State's jurisdictional limits notwithstanding a previously existent situs originally established by law at the domicile of the property-owner. Ayer & Lord Tie Co. v. Kentucky, 1906, 202 U.S. 409, 26 S.Ct. 679, 50 L.Ed. 1082, 6 Ann. Cas. 205; Southern Pacific Co. v. Commonwealth of Kentucky, 1911, 222 U.S. 63, 32 S.Ct. 13, 56 L.Ed. 96. See also: 51 Am. Jur. (1944), §§ 453, 454, pp. 468, 469; §§ 461, 462, p. 474; §§ 803, 807, pp. 721, 725; §§ 912, 913, pp. 807–809.

That neither the corporate domicile States of Delaware nor Pennsylvania choose to tax the respective plaintiffs' watercraft, adds nothing to defendants' claimed right of taxation. So far as the State of Louisiana and the City of New Orleans are concerned, it is of no legal moment whatever that all of said property forever remains totally untaxed, unless and until they do satisfactorily establish their right to, themselves, tax the said property.

Since, as has been repeatedly held by the United States Supreme Court, the State of its origin remains the permanent situs of a corporation's movables, *no matter whether they successively move across the State's boundaries for varying periods of time, provided they ever return to the State and never become permanently joined to and intermingled with movables having a tax situs in another state,* it is clear that none of Union's tugboats and barges did ever acquire a taxation situs in Louisiana. They were never permanently situated therein, as "permanently" is defined in the late case of Northwest Air Lines, Inc., v. State of Minnesota, 1944, 322 U.S. 292, 295, 64 S.Ct. 950, 88 L.Ed. 1283, 1286, 153 A.L.R. 245; rehearing denied, 323 U.S. 809, 65 S.Ct. 26, 89 L.Ed. 645. See also: People of State of New York ex rel. New York C. & H. R. R. Co. v. Miller, 1906, 202 U.S. 584, 597, 26 S.Ct. 714, 50 L.Ed. 1155, 1160; and Johnson Oil Refining Company v. State of Oklahoma, 1933, 290 U.S. 158, 54 S.Ct. 152, 78 L.Ed. 238, and cases therein cited.

While the watercraft of both American and Mississippi Valley were never within the boundaries of Delaware, that State was, nevertheless, legally instituted the situs of such movable property by virtue of the plaintiffs' respective incorporation under authority of its laws; and neither the State of Louisiana nor the City of New Orleans may tax any of said property without first showing that, as to the particular property sought to be taxed, there has actually taken place substitution of a Louisiana tax situs for that of Delaware. Under the hereinabove detailed circumstances attending the interstate commerce operations of both of said named plaintiffs, it cannot be truly said that the presence of either plaintiff's watercraft within Louisiana was at any time of that "permanent" character necessary to fix and establish a new situs for the imposition of taxes therein.

As the Supreme Court of the United States observed with reference to certain ships operating between New York and San Francisco, and between the latter port and others, within the then Oregon Terri-

tory, in the case of Hays v. Pacific Mail Steamship Company, 17 How. 596, 15 L.Ed. 254, decided in 1855, so, too, did none of the "taxed" movable property of either Union, American, or Mississippi Valley, ever enter the State of Louisiana, or come within any port thereof, except to discharge and take on cargo, "independently of any control over them, except as it respects municipal and sanitary regulations of the local authorities, such as are not inconsistent with the Constitution and laws of the general government, to which belongs the regulation of commerce with foreign nations and between States." 17 How. at page 599, 15 L,Ed. 254.

In said Hays Case, it was established that the ships regularly visited, after discharging mail, passengers and freight at San Francisco in approximately one day, a naval dock and shipyard owned and operated by the defendant shipping company, for furnishing and repairing its steamers, at the port of Benicia, California; and that each ship there remained until the commencement of its next voyage, or, usually, ten to twelve days.

But the Supreme Court, nevertheless, held that the State of California had no jurisdiction over the vessels for the purpose of taxation, since none were "properly abiding within its limits, so as to become incorporated with the other personal property of the State," inasmuch as temporary presence in any California port in the character of water carriers engaged in commerce wholly excluded the idea that they came to the State for the purpose of permanently abiding therein, which would have created a California taxation situs.

This Hays case has been cited approvingly by the Supreme Court ever since 1855, to the point that a vessel engaged in interstate commerce is, primarily, not subject to taxation in other state than the one of its owner's domicile, when it only incidently and temporarily touches at out-of-state ports for the purpose of delivering or receiving freight, because the vessel is not, in any proper sense, abiding within that state." See: Morgan v. Parham, 1873, 16 Wall. 471, 83 U.S. 471, 21 L.Ed. 303; Southern Pacific Company v. Commonwealth of Kentucky, 1911, 222 U.S. 63, 32 S.Ct. 13, 15, 17, 56 L.Ed. 96. See also: Pullman's Palace-Car Co. v. Commonwealth of Pennsylvania, 1891, 141 U.S. 18, 11 S.Ct. 876, 878, 35 L.Ed. 613.

In the Morgan case, supra, which basically involved the attempted assessment as personal property in the City of Mobile, Alabama, of certain vessels, including the steamer Frances, property of one Morgan, citizen of New York, from which state said vessel, having been first duly registered at the Port of New York under Morgan's ownership, was brought down to Mobile in 1865. The Frances immediately engaged in the coasting trade between Mobile and New Orleans, from that time until the trial in 1870, and was enrolled at the customhouse in Mobile by her master as a coasting vessel in 1867, her yearly license as such being thereafter renewed in 1868 and 1869. The vessel, with others, constituted a daily line of steamers plying between the two named ports and the Frances touched at Mobile, and at New Orleans, no less than three times a week. Her captain was a resident of Mobile; and also a resident of the city was the vessel's business agent, conducting her affairs within the port. He occupied an office and he employed and paid the persons who there assisted him in the service of the line. However, he, himself, was under control of a superior agent residing in New Orleans, by whom both captain and crew were paid. In Mobile, furthermore, a wharf was maintained and occupied in the conduct of the vessels' operation in such coastwise traffic.

Upon these main facts devolved the question, said the Supreme Court, whether the Frances was subject to taxation as personal property, under the laws of Alabama.

The Federal Court below had rendered judgment upholding the assessment, and subsequent seizure of the Frances for the non-payment of the tax levied, and it was insisted by the defendant in error, Parham, before the Supreme Court, that the vessel was personal property resting within the State of Alabama, and, therefore, properly taxable as such. On the other hand, plaintiff in error, Morgan, contended that

the vessel was owned in New York, had never become blended with the commerce and business of Alabama, and being so operated in the interstate coasting trade, her taxation in Alabama violated the Constitutional grant to Congress of the exclusive power to regulate commerce among the States. Art. 1, Sec. 8, Cl. 3.

The Supreme Court, quite naturally, observed that the Frances, although a vehicle of commerce, was not ipso facto exempt from taxation, but, nevertheless, held:

"It is the opinion of the court that the state of Alabama had no jurisdiction over this vessel for the purpose of taxation, for the reason that it had not become incorporated into the personal property of that state, but was there temporarily only, and that it was engaged in lawful commerce between the states with its situs at the home port of New York, where it belonged and where its owner was liable to be taxed for its value. The case of Hays v. [Pacific Mail] Steamship Co. 17 How. 596, 15 L. Ed. 254, is decisive of the case before us. * * *."

"Whether the steamer Frances was actually taxed in New York during the years 1866 and 1867 is not shown by the case. It is not important. She was liable to taxation there. That state alone had dominion over her for that purpose. * * *

"The jurisdiction of this court over the present case, as in the case of Hays v. [Pacific Mail] Steamship Co. supra, arises from the facts: first, that the property had not become blended with the business and commerce of Alabama, but remained legally of and as in New York; and second, that the vessel was lawfully engaged in the interstate trade, over the public waters. It is in law as if the vessel had never before or after that day been within the Port of Mobile, but touching there on a single occasion when engaged in the interstate trade, had been subjected to a tax as personal property of that city. Within the authorities it is an interference with the commerce of the country not permitted to the states.

"The judgment must be reversed."

The Louisiana taxing authorities here urge that the law of Louisiana requires that "the rolling stock or movable property of any railroad company, telegraph company, canal company or other transportation company, whose line lies partly within this state and partly within another state, or states, or whose sleeping cars run over any line lying partly within this state or partly within another state or states, shall be assessed in this state in the ratio which the number of miles of the line within the state has to the total number of miles of the entire lines." (6 Dart's Gen.Stat. § 8370, Sec. 29 of Act 170 of 1898, as amended by Act 152 of 1932), and that in view of the factual situation reflected by the record herein concerning the operation of each one of the four "lines" of transportation, other than railroad, telegraph, canal, and sleeping-car companies, the movable property of each such "other transportation company" is properly subject to taxation in Louisiana, within the scheme of "ratio assessment" prescribed.

Great reliance is placed by the defendants upon the case of Pullman's Palace-Car Company v. Commonwealth of Pennsylvania, 141 U.S. 18, 11 S.Ct. 876, 879, 35 L Ed. 613, but, conceding for the present purpose that each one of the four plaintiffs and their respective transportation systems can fairly be brought within the intendment of the legislative expression when the lawmaker speaks of "other tranportation companies," in connection with a railroad company, a telegraph company, a sleeping-car company, a canal company, and their "lines," it is interesting to note that the Supreme Court's decision was plainly based upon this finding of fact, viz.:

"The cars of this company within the state of Pennsylvania are employed in interstate commerce; but their being so employed does not exempt them from taxation by the state; and the state has not taxed them because of their being so employed, but because of their being within its territory and jurisdiction. The cars were continuously and permanently employed in going to and fro upon certain routes of travel. If they had never passed beyond the limits of Pennsylvania, it would not be doubted that the state could tax them, like other property within its borders, notwithstanding they were employed

in interstate commerce. The fact that, instead of stopping at the state boundary, they cross that boundary in going out and coming back, cannot affect the power of the state to levy a tax upon them. The state, having the right, for the purposes of taxation, to tax any personal property found within its jurisdiction, without regard to the place of the owner's domicile, could tax the specific cars which at a given moment were within its borders. The route over which the cars travel extending beyond the limits of the state, particular cars may not remain within the state; but the company has at all times substantially the same number of cars within the state, and continuously and constantly uses there a portion of its property; and it is distinctly found, as matter of fact, that the company continuously, throughout the periods for which these taxes were levied, carried on business in Pennsylvania, and had about 100 cars within the state.

"The mode which the state of Pennsylvania adopted to ascertain the proportion of the company's property upon which it should be taxed in that state was by taking as a basis of assessment such proportion of the capital stock of the company as the number of miles over which it ran cars within the state bore to the whole number of miles in that and other states over which its cars were run. This was a just and equitable method of assessment; and, if it were adopted by all the states through which these cars ran, the company would be assessed upon the whole value of its capital stock, and no more. The validity of this mode of apportioning such a tax is sustained by several decisions of this court in cases which came up from the circuit courts of the United States, and in which, therefore, the jurisdiction of this court extended to the determination of the whole case, and was not limited, as upon writs of error to the state courts, to questions under the constitution and laws of the United States."

After reviewing and commenting upon several of such previous rulings, the Supreme Court observed that even more in point than any of the other cases which it had just mentioned, was the case of Marye v. Baltimore & Ohio Railroad Co.,

127 U.S. 117, 8 S.Ct. 1037, 32 L.Ed. 94; which case was decided in 1888 and affirmed the judgment of the lower Federal Court that had enjoined the attempted collection by Virginia taxing authorities of taxes levied against the railroad company, a Maryland corporation, whose rolling-stock was specially exempted from taxation by the charter provisions. No part of the railroad company's roadway lay in Virginia, but it nevertheless operated its railroad with its own engines and cars within that state, under contracts of lease, on and over established roadbeds and tracks of several Virginia corporations, none of which owned any rolling stock.

These Virginia corporations, four in number, duly paid taxes assessed upon and against their respective roadways, tracks, depots, and other real estate owned by them, but, of course, were not assessed for the railroad rolling-stock owned by the Baltimore and Ohio Railroad Company and continuously operated by it on and over the track systems and operating appurtenances laid on Virginia soil, under the following conditions, detailed at greater length in the Supreme Court decision, viz.: no such rolling stock was assigned permanently to the four leased Virginia lines mentioned, or either of them; the trains, composed of the B. & O. equipment, or rolling stock, ran from Lexington, Virginia, over said four lines into West Virginia, and thence into Maryland, to Baltimore, or, if any cars were destined for points west, thence from Harper's Ferry in that direction. None of such rolling stock was assigned permanently to service in Virginia, but was used interchangeably upon the main line and branches of the B. & O. railroad system, so operated in Maryland and Virginia, and also upon the divisions of said Baltimore and Ohio Railroad in Pennsylvania and in states west of the Ohio River, just as varying necessities made demand upon the service rendered by the railroad company.

The Virginia statute under which it was sought to collect taxes assessed upon the constant quantity of B. & O. rolling-stock, so continuously within Virginia although ever changing in particular component parts, prescribed that every railroad and

canal company "not exempted from taxation by virtue of its charter" should annually report its property to the therein designated State officer for assessment and taxation, classifying the same under the following heads: roadway and track, or canal bed, depots, depot grounds and lots, station buildings and fixtures, and machine shops, all other real estate, rolling-stock, of all kinds, boats, machinery, and equipments, houses and appurtenances occupied by lock-gate keepers and other employees, stores, telegraph lines, and, finally, miscellaneous property. And it was, furthermore, specially directed that every such railroad and canal company should additionally report annually to said official the gross and net receipts of the road or canal, and if such road or canal lay only partly within Virginia, then such part had to be shown in relation to the entire length of road or canal, with the reported receipts duly apportioned.

The statute in question, which, admittedly, was the only Virginia legislation, if any, justifying the assessment of the B. & O. rolling-stock, specially provided that, upon the failure of any railroad or canal company to so make the required reports, the same was to be immediately assessed, its real estate and rolling-stock rated at $20,000 per mile, and a tax levied on such value at the current annual rate of taxation in force; and that upon the tax levied remaining unpaid, the assessed property should be seized and sold.

The single question before the Supreme Court, as it observed, was whether the Baltimore and Ohio Railroad Company, under the circumstances detailed, was liable to taxation by the State of Virginia, with respect to the aforementioned rolling-stock that its owner had not reported for assessment.

The Court found that the statutory language referred to only such railroad and canal companies as derived their authority from the State of Virginia, and whose taxable property lay within the State; and confirmed the existent injunction prohibiting the attempted collection of the taxes assessed upon and against the B. & O. rolling-stock.

But the Supreme Court took occasion to say that which suggested the observation that it made three years later, in deciding the Pullman Palace-Car Co. Case, in 1891, viz.:

"It is not denied, as it cannot be, that the state of Virginia has rightful power to levy and collect a tax upon such property used and found within its territorial limits, as this property was used and found, if and whenever it may choose, by apt legislation, to exert its authority over the subject. It is quite true, as the situs of the Baltimore & Ohio Railroad company is in the state of Maryland, that also, upon general principles, is the situs of all its personal property; but for purposes of taxation, as well as for other purposes, that situs may be fixed in whatever locality the property may be brought and used by its owner by the law of the place where it is found. If the Baltimore & Ohio Railroad Company is permitted by the state of Virginia to bring into its territory, and there habitually to use and employ, a portion of its movable personal property, and the railroad company chooses so to do, it would certainly be competent and legitimate for the state to impose upon such property, thus used and employed, its fair share of the burdens of taxation imposed upon other similar property used in the like way by its own citizens. And such a tax might be properly assessed and collected, in cases like the present, where the specific and individual items of property so used and employed were not continuously the same, but were constantly changing, according to the exigencies of the business. In such cases the tax might be fixed by an appraisement and valuation of the average amount of the property thus habitually used, and collected by distraint upon any portion that might at any time be found. Of course, the lawfulness of a tax upon vehicles of transportation used by common carriers might have to be considered, in particular instances, with reference to its operation as a regulation of commerce among the states; but the mere fact that they were employed as vehicles of transportation in the interchange of interstate commerce would not render their taxation invalid. No question on that account arises in this case. * * "

In both the Marye Case (1888) and the Pullman's Palace-Car Co. Case (1891), supra, as well as in the later cases of American Refrigerator Transit Co. v. Hall, 1899, 174 U.S. 70, 19 S.Ct. 599, 43 L.Ed. 899, Union Refrigerator Transit Co. v. Lynch, 1900, 177 U.S. 149, 20 S.Ct. 631, 44 L.Ed. 708, Union Refrigerator Transit Co. v. Commonwealth of Kentucky, 1905, 199 U.S. 194, 26 S.Ct. 36, 50 L.Ed. 150, 4 Ann.Cas. 493, Union Tank Line v. Wright, 1919, 249 U.S. 275, 39 S.Ct. 276, 63 L.Ed. 602, and Johnson Oil Ref. Co. v. State of Oklahoma, 1933, 290 U.S. 158, 54 S.Ct. 152, 78 L.Ed. 238, the United States Supreme Court has uniformly held that where a corporation brings into a state other than the one granting it the corporate charter, a portion of its movable property to therein employ and use the same in the conduct of its business operations for profit, carried on as one entity, in more than one state, such permanently established portion may be constitutionally taxed in said second state, by resorting to the generally adopted and approved method of first valuing as a unit the entirety of the taxable corporate property employed in the interstate operations, taking into consideration the uses to which it is put and all elements making up its aggregate value, and then ascertaining what proportion of the corpus may be fairly taxed as being within the bounds of the State in interest, without violating any Federal restriction.

But never has any such assessment and taxation been approved by the Courts until and unless the State other than the one of corporate domicile, first satisfactorily established that within its borders, for the whole of the taxable year, the particular portion of the property sought to be taxed was regularly and habitually used and employed—that there actually existed within the state, the taxation situs of such portion of said property.

No such situs, however, existed in the State of Louisiana during the taxable years at issue, as respects any of the "taxed" watercraft of American, Mississippi Valley, and Union, and each is, apparently entitled to the refund of the "taxes" that were paid under protest.

But the same is not wholly true as to the "taxed" DeBardeleben equipment. Its two tugs and ten barges, employed in interstate commerce transportation out of the Port of New Orleans, were taxable, but they were not legally taxed when the assessing authorities attempted to levy taxes on such equipment on the mileage basis, and the taxes which were thereupon paid under protest by DeBardeleben should likewise be refunded.

The DeBardeleben tugs Coyle and C. F. DeBardeleben and the barges DB208, DB212, DB1086, DB1095, DB1107, DB1110, DB1844, DB1845, DB1925, and WGC41, are found to have been permanently established at New Orleans, Louisiana, during the taxable years 1943 and 1944, and, continuously theretofore, because it was no earlier than 1937 that the DeBardeleben Coal Corporation, miner of coal and processor of coke in the State of Alabama, "merged" its operations with those of W. G. Coyle & Company, Inc., a Louisiana corporation, operating an old-established business concern of New Orleans which, continuously since 1865, had conducted a large boat terminal and the movement of vessels within the port of New Orleans and, since 1934, had also operated as a water common carrier from, to, and through, said port of New Orleans, mainly via the Gulf Intracoastal Waterway to and from its western terminus, in Texas, and its eastern, at Carrabelle, Florida. And upon so merging the respective operations of DeBardeleben and Coyle, such terminal and water transportation activities were carried on without interruption or material change, in and from New Orleans, by the Marine Division of DeBardeleben, using the name of Coyle Lines as a trade name, in order to benefit from the worldwide reputation previously established by the Coyle Company's sixty-two years of marine activity in and from the port of New Orleans.

Undoubtedly, never did DeBardeleben intend that either one of its two tugs or ten barges should ever be stationed permanently within any port or state other than New Orleans and the State of Louisiana. While the equipment was operated, along with chartered tugs and barges, in

interstate, as well as in intrastate, commerce and regularly left the port of New Orleans and the State of Louisiana, traveling in westerly direction to Texas ports or easterly as far as Carrabelle, Florida, nevertheless not once was tug or barge of DeBardeleben made to journey in either direction with the purpose in mind of having the vessel abide in another state, to there commingle with whatever movable property permanently rested therein, and thereby acquire a tax situs in said neighboring state. On the contrary, the predetermined course of each vessel's movement out of the port of New Orleans always contemplated the vessel's early return thereto, and not once did a tug or barge become permanently attached anywhere else. Having elected in 1937 to continue the Coyle Company's activities in and out of the port of New Orleans with the Coyle marine equipment taken over in the "merger," and very probably added to them and thereafter, DeBardeleben must be held to have clearly indicated its intent and purpose to continue under the protection of the State of Louisiana, domiciliary state of W. G. Coyle & Company, Inc., all of its marine equipment employed in terminal and water transportation operations at and from the port of New Orleans.

The consequence of its having so done was to confirm Louisiana as the already existent tax situs of all of said movable property, and whatever additions were then or subsequently made thereto, to so remain unchanged until there was effected the legally-possible establishment of another tax situs for all or a portion thereof, by the permanent removal to another state of all or part of said property.

If the eight barges that during the whole of 1943 and 1944 served the private needs of DeBardeleben in the prosecution of its coal mining and coke processing operations within the State of Alabama thitherto functioned as units of the common carrier operations of Coyle Lines in and from Louisiana, their transfer to Alabama and assignment to the status of private carriers serving their owner's exclusive purposes, wholly within that State, certainly operated a change in their previously existing tax situs: or, if this equipment never formed part of said common carrier water transportation operations of Coyle Lines, but, originally, began plying the Warrior River from Coyle to Holt, Alabama, moving coal from DeBardeleben's mines to its coke processing plant, they need not be so considered as dismembered former units of said Coyle Lines; and, in either event, serious error was committed by the Louisiana taxing authorities in including them in the watercraft of Coyle Lines which said officials sought to tax for 1944 and 1945 on the mileage basis, resort to which they claim to have been justified when DeBardeleben contended, apparently in good faith, that no tax situs existed in Louisiana with respect to the two tugs and ten barges employed in its water transportation operations in and out of the port of New Orleans, and the aforementioned eight barges operating as private carriers wholly within the State of Alabama.

Even if, as a matter of law, the proper course of action to have been followed by the taxing authorities, under the circumstances confronting them, was to attempt a mileage basis assessment, it is found that there was no due compliance with the only Louisiana law directing assessment of movable property of "any railroad company, telegraph company, canal company or other transportation company, whose line lies partly within this state and partly within another state, or states, * * * in the ratio which the number of miles of the line within the state has to the total number of miles of the entire lines." Section 29 of Act 152 of 1932, 6 Dart Louisiana General Statutes, § 8370, relied upon, apparently envisaged no such factual situation as existed with reference to Coyle Lines, the tax situs of whose two tugs and ten barges, used in its water transportation operations in intrastate as well as interstate traffic in and out of the State of Louisiana, was none other than that State alone; no specific portion of said equipment having ever been withdrawn from the protection of its laws to that of another state, and there joined to and mingled with the corpus of the mova-

ble property of such state while nevertheless continuously employed and used therein by Coyle Lines as a working unit of its one common carrier operation in interstate commerce between Louisiana and said second state.

The first portion of the aforementioned Section 29 specifically provided that: "The real estate, road-beds, roads, iron, tracks, depots, sheds, freight sheds, warehouses, oil and water tanks, round houses, shops, superstructures, excavations and channels of railroads, canals, and other transportation, telephone and telegraph companies" were to be assessed and taxed in the parish or assessment district *where located,* and that ferry boats, tugs, barges or other watercraft, or rolling equipment, etc., locomotives, passenger and freight trains, automotive equipment, and vehicles of all kinds, if plying between two or more parishes were to be assessed and taxed in equal proportionate parts by the parishes in interest, while all other property of said railroad, canal, etc., not specially exempted from taxation by the State Constitution, was to be assessed and taxed "at the domicil or principal office of said railroads, canals, etc., as contemplated" by Section 4 of Article XIII of said Louisiana Constitution of 1921. Then followed immediately, the quoted provision relating to assessment and taxation *only* when there exists in Louisiana a situs for a portion of the corporate property employed, as one entity, in interstate commerce and a like situs exists as to another portion, or portions, in another state or states.

The evidence is to the effect that DeBardeleben, as it always did, made due return for taxation of Coyle Terminal and of property in, on, and about the premises, including its collier, derrick barge, and other like harbor watercraft, and duly paid the taxes assessed thereon, each of the years 1944 and 1945. The evidence furthermore shows that, for the first time, apparently, the Louisiana Tax Commission sought to assess for taxation the DeBardeleben watercraft operated beyond the bounds of the port of New Orleans, and that, upon being resisted, did place an estimated value upon all of such equipment, did estimate the total mileage in, and out, of the State

of Louisiana, traveled by the DeBardeleben equipment under the Coyle Lines name, and did make the challenged mileage basis assessment for 1944, and repeated it as to 1945, under which DeBardeleben was called upon to pay, and did pay under protest, the taxes for said years which it here seeks to have refunded.

No more than the other three plaintiffs, whose respective cases have already been otherwise disposed of, does DeBardeleben seek to have the "assessed taxes" reduced in amount. All attack the asserted legality of the attempted assessments and the resultant taxes exacted thereunder. Each plaintiff contends that the "assessment" affecting its property was placed thereagainst by reason of capricious and arbitrary action on the part of the taxing authorities and that the "taxes" called for by virtue thereof, and which each plaintiff in interest paid under protest, should not be retained by the State of Louisiana and the City of New Orleans, respectively, because their so doing operates the taking of plaintiff's property without due process of law, in flagrant violation of Federal and State constitutional prohibitions.

It serves no useful purpose, therefore, for defendants to press their respective contentions to the effect that DeBardeleben is estopped from questioning the assessments thus made with reference to its watercraft employed in traffic beyond the port of New Orleans; and no citation of authority in support of this conclusion appears necessary.

Notwithstanding the foregoing findings concerning the operations of the four plaintiffs, and notwithstanding the stipulations entered into by said plaintiffs and hereinabove specially referred to, this Court finds itself without jurisdiction to adjudicate with respect to the matter in controversy in three of the actions submitted to it for decision, because in neither does the plaintiff pray for an amount in excess of $3,000, exclusive of interest and costs; said three actions being: (1) that of Union Barge Line Corporation v. No. 1453 C.A., George Montgomery, State Tax Collector, and (2) the two (2) of DeBardeleben Coal Corporation versus the

said named Tax Collector, i.e. No. 1028 hereinabove listed, and No. 1470, seeking the recovery of the 1945 taxes paid under protest, and included in one of the parties' stipulation.

It is beyond the power of the parties to confer jurisdiction and said three actions must, therefore, be ordered dismissed at plaintiffs' costs, and are no longer before the Court.

In view of all of the foregoing, and by way of formal recapitulation, the Court now makes the following findings of fact and conclusions of law, to-wit:

### Findings of Fact.

1. The watercraft of American Barge Line Company, Mississippi Valley Barge Line Company, and Union Barge Line Corporation, respectively, never abided in the State of Louisiana nor did any of said watercraft, while moving in constant interstate commerce traffic and intermittently coming into said State, ever remain therein for any more than such comparatively short periods of time as were required to discharge and take on cargo, or to make necessary emergency and temporary repairs to any unit of a tow.

2. The State of Louisiana was never the legally-constituted domicile of either of said three plaintiff corporations.

3. The corporate domicile of (a) the American Barge Line Company and the Mississippi Valley Barge Line Company, respectively, was in the State of Delaware, and (b) that of Union Barge Line Corporation, in Pennsylvania.

4. (a) None of the watercraft of said two Delaware corporations, respectively, were ever within the bounds of Delaware, but (b) the watercraft of Union Barge Line Corporation were within Pennsylvania and regularly operated therefrom in interstate commerce.

5. DeBardeleben Coal Corporation, a Delaware corporation, was merged or consolidated, in 1937, with W. G. Coyle and Company, Inc., a Louisiana corporation, which was then operating a marine terminal and a harbor traffic business within the port of New Orleans.

6. Such Coyle business had been in existence ever since the year 1865.

7. To its operations had been added, in 1934, a common carrier water transportation business, mainly in the Gulf Intracoastal Waterway, running westerly, as well as easterly, from the port of New Orleans.

8. From 1937 on, the said Coyle operations were continued without interruption or material change under the name of Coyle Lines, as the Marine Division of said DeBardeleben Coal Corporation was designated by it, in order to benefit by the long-established world-wide business reputation enjoyed by W. G. Coyle & Co. Inc.

9. The main office of said Marine Division, from which were controlled and carried on continuously, in the main, all of said Coyle operations, was located at New Orleans, and so was the only machine and repair shop maintained by Coyle Lines for upkeep and repair of its watercraft.

10. At said New Orleans office, the crews of the Coyle tows were regularly paid their wages, and to it the employees reported at the customary taking of the usual twenty-four hour lay-off called for under the Union labor contract, at the end of each six-day work period.

11. At the Coyle Terminal, the fueling of the tugs operated by Coyle Lines was usually done, and so, too, as a rule, were done at the Terminal, all scheduled general repairs, or minor "voyage" repairs, needed by the Marine Division's watercraft.

12. None of the Coyle Lines' watercraft was ever in the DeBardeleben Coal Corporation's domiciliary State of Delaware.

13. None of said Coyle Lines' watercraft ever permanently left its original situs in Louisiana, except eight barges which DeBardeleben Coal Corporation specially assigned and dedicated to private carrier status, hauling its own coal wholly within the State of Alabama, on the Warrior River, between Coyle and Holt, said State.

14. Coyle Lines operated its common carrier water transportation business out of the port of New Orleans with its own

two tugs, i.e., the Coyle and the C. F. De-Bardeleben, and its ten barges, to which equipment it added chartered tugs, to the number of approximately eight, and many barges, depending upon the tonnage offered for transportation.

Conclusions of Law.

1. Under Section 24(1) of the Judicial Code, as amended, 28 U.S.C.A. § 41(1), this Court is vested with jurisdiction in all of the actions presented to it for adjudication (except the one of the Union Barge Line Corporation and the two of the DeBardeleben Coal Corporation, Nos. 1453, 1028, and 1470, respectively, hereinabove specially referred to and ordered dismissed for want of jurisdiction) inasmuch as in each of said remaining actions, which are founded on diversity of citizenship, there also exists a federal question concerning the continued retention of the illegal taxes collected, and segregated awaiting the termination of the litigation with respect thereto, and, moreover, the matter in controversy exceeds, exclusive of interest and costs, the sum or value of $3,000.

2. No tax situs with respect to any of the watercraft of American Barge Line Company, Mississippi Valley Barge Line Company, and Union Barge Line Corporation, respectively, has existed in the State of Louisiana at any time, and none of said watercraft was ever legally taxable within the said State.

3. The taxes which were assessed upon and against any portion of either of said three plaintiff corporations' watercraft were all illegally assessed and collected.

4. Said American Barge Line Company and Mississippi Valley Barge Line Company are entitled to recover from both of the defendants, as said plaintiffs have prayed for respectively, in their original complaints against the State Tax Collector for the City of New Orleans, and in their original and supplemental complaints against the Commissioner of Finance and ex-officio City Treasurer of the City of New Orleans, State of Louisiana, relating to the taxes of the year 1944; and, also, in view of the parties' stipulation to that effect made and entered into, in open Court, at the trial on January 14, 1946, to likewise recover as prayed for in their respective complaints relating to similar taxes of 1945, by them likewise paid under protest.

5. Said Union Barge Line Corporation is entitled to recover only as it has prayed for against said mentioned Commissioner of Finance and ex-officio City Treasurer of the City of New Orleans, State of Louisiana, with reference to the taxes of 1945.

6. The tax situs of all of the DeBardeleben Coal Corporation's Coyle Lines watercraft employed in its common carrier water transportation operations out of the port of New Orleans, was in the State of Louisiana alone.

7. The tax situs of the eight DeBardeleben Coal Corporation's coal-carrying barges, hauling its own coal on the Warrior River, entirely within the State of Alabama, during the whole of the years 1943 and 1944, was nowhere else than in said State of Alabama where the said eight barges were permanently located.

8. The attempted assessment of any of the taxable movable property of Coyle Lines, which had its sole taxation situs within the State of Louisiana, as that of a transportation company whose "line" lay partly within that state and partly within another state or states, was illegal, null and void.

9. The taxes exacted thereunder, from DeBardeleben Coal Corporation, were illegal.

10. DeBardeleben Coal Corporation is entitled to recover as prayed for in its original and supplemental complaints against the Commissioner of Finance and ex-officio City Treasurer of the City of New Orleans, State of Louisiana, relating to the taxes of the year 1944; and, in view of the parties' stipulation to that effect made and entered into, in open Court, at the trial on January 14, 1946, to likewise recover as prayed for in its complaint against him relating to similar taxes of 1945, by it likewise paid under protest.

11. The continued retention of any of the aforementioned illegal taxes, paid under protest by the respective parties in interest, constitutes a taking of property without due process of law, in violation of the Federal and State Constitutions.

Let a judgment, in consonance with the foregoing, be, therefore, entered in each of the above mentioned actions; and let proper record be made of the dismissal, for want of jurisdiction, of the three actions to which the foregoing formal findings of fact and conclusions do not relate.