UNITED STATES of America,
Plaintiff,

v.

EASTERN AIR LINES, Inc.,
Defendant.

EASTERN AIR LINES, Inc.,
Plaintiff,

v.

UNITED STATES of America,
Defendant.

Civ. Nos. 10810, 10933.

United States District Court
E. D. New York.

July 15, 1955.

Leonard P. Moore, U. S. Atty., for the Eastern Dist. of New York, Brooklyn, N. Y., By Arthur D. Hickerson, and Joseph M. Soviero, Asst. U. S. Attys., Brooklyn, N. Y., for the United States.

Haight, Gardner, Poor & Havens, New York City, By William J. Junkerman, New York City, and James B. McQuillan, of counsel, for Eastern Air Lines, Inc.

BYERS, District Judge.

These cases consolidated for trial resulted from the wrecking of a localizer building and serious damage to its equipment, on December 30, 1945 by the

Eastern Air Lines (to be called Eastern) DC–3 plane which over-ran Runway 4, LaGuardia Field, and continued through the localizer building beyond the end of the runway and out into Flushing Bay; there it floated for a sufficient time so that all on board save one, were rescued.

The hour was about 9:13 P.M. and the over-running resulted from the failure of the brakes of the landing gear to stop the plane, because of the presence of snow and slush on the runway; the latter is 5,000 feet long, but the plane landed about halfway along, or about 2,500 feet from the far end under conditions which the pilot deemed to be emergent. Hence the failure of braking action to avoid the outcome which has been stated.

Although the pilot knew of the presence of the localizer building, 175 feet beyond the end of Runway 4, he was not aware that his plane had struck it, or of any effect upon the forward progress of the plane.

The controversy does not involve the incidents above summarized, but certain aspects of the situation in its entirety.

The first cause was instituted in the Southern District by the Government to recover for damage sustained in the wrecking of the localizer building and to the equipment. The answer asserted a counterclaim for damage to the plane. That suit was transferred to this court.

The second cause was instituted here by the Eastern against the Government for the same damage as was asserted in the counterclaim filed in the first case. As the result of a stipulation the pleadings were amended so that the Government now pleads contributory negligence and assumption of risk on the part of Eastern, the Government to have the right to open and close. Later stipulations imported into Eastern's case the assertion that the erection and maintenance of the localizer building constituted negligence and also a nuisance.

The Federal Tort Claims Act, 28 U.S. C.A. §§ 1346, 2671 et seq., is relied upon for Eastern which the Government asserts does not apply; also that the nuisance aspect of the Eastern case is barred by limitation. This defense seems to have been abandoned.

The various contentions will now be examined.

### The Localizer Building.

This was a wooden structure located on and across the center line of an extension of Runway 4, 58′ 4″ x 12 x 8. The 12 foot width was reduced to 8 feet on each wing. Thus the building lay athwart the extension of the runway and 175 feet beyond its N.E. end and about 25 feet inside the shore of Flushing Bay. Erection took place in 1942, over three years prior to the happening involved.

The equipment so housed consisted of transmitters resting in a water-tight underground foundation, with antenna above ground. These were required— according to then current technical teaching—to be located on a projection of the center line of the runway. Since there is no testimony or indeed argument to the contrary, the finding is that the localizer building was properly placed over the center line as extended, of Runway 4. As to its height there is something further to be said.

It is likewise found that the localizer building occupied the place that it did under the authority of the C.A.A., which approved of the site.

In support of this finding it will be sufficient to quote the statement of defendant's counsel in the record (p. 211):

"As a matter of fact, more than under the authority (of the C.A.A.). They were the ones that paid for it, they were the ones that were responsible for putting it there."

While the building was 8 feet in height above the extension on which it rested, it was actually between 5 and 5½ feet above the plane of the runway itself, because the extension sloped downward to the side of Flushing Bay; at the southerly face of the building (175 feet from the northerly end of the runway), the

surface of the extension was 1½ feet below the plane of the runway.

The foregoing is a finding as to which it is understood that there is no contest.

The equipment of the localizer is found to have consisted of a localizer transmitter which provided a radio beam to furnish directional guidance with respect to the center line of the runway; and two (three?) markers intended to give "positional guidance or position fix indication to the approaching aircraft."

There were obstruction lights on the roof of the building, "because the building itself constituted an intrusion above the obstruction plane defined by Civil Aeronautic standards" according to the testimony of the witness Brown of the C.A.A., who was in 1941 Construction Engineer attached to the C.A.A. and is now Chief of the Facilities of Region 1 (C.A.A.).

There is no testimony to establish whether the "obstruction plane" is that of the runway, in which case the "intrusion" would be from nil to 6 inches, or of the extension in which case it would be 36 inches.

■ The argument that the Civil Aeronautic Act of 1938, as expounded in the Civil Air Regulations No. 525.1 and 525.3 taken with the testimony relied on by Eastern, spell out negligence on the part of the Government, is tenuous to the point of dissolution.

In the practical sense it took the Eastern three years and this misadventure to discover the alleged negligence of which for the first time it now complains. Of course if the plane had not plowed through the building, it would probably have moved out further into Flushing Bay than it did. The failure of the brakes to stop the plane was not due to the presence of the localizer structure, but to the fact that the plane did not land on the runway soon enough.

The pilot was entirely familiar with the structure having used this runway on numerous occasions, but never made complaint about it; on this night the obstruction lights were showing, and yet the pilot was unaware as has been stated, of even the striking of the building by his plane.

It is found that the localizer building was not a hazard, and that negligence is not to be imputed to the United States Government for the original erection thereof and its continued maintenance until December 30, 1945.

The foregoing is based upon the exhibits which depict the original action of the C.A.A. in sanctioning the placing of the structure in the place that it occupied, and the testimony of the Government witness Brown which was not discredited.

It is further found that the action of the C.A.A. was the exercise of a discretionary official function within the authority conferred by the Act, 49 U.S. C.A. § 452.

The argument for Eastern which is thus stated: "However, once the discretion to install a localizer had been exercised, there was no discretion to install, construct or maintain the localizer negligently and wrongfully in a location where it was an obstruction to air navigation, a hazard to air navigation, a menace to air navigation and a nuisance" —seeks to create a distinction or series of distinctions where none is to be perceived.

The decision to install as shown in the exhibits included the site. Naturally that was an essential to any decision at all, since it could not be authorized to be erected in thin air or in an undesignated place. The erection would have been idle unless maintenance were to ensue. Nothing has been asserted by way of criticism of the nature or character of the installation or its functioning; and there is no even slightly persuasive evidence, that it was either a hazard or a menace. Had it been such, the Eastern could have been expected to file an appropriate protest at some convenient time during the three years next preceding December 30, 1945.

■■ The argument that the localizer was a nuisance is equally fallacious.

Reliance is had upon the General Municipal Law of the State of New York, McK.Consol.Laws, c. 24, § 355 and § 356 which need not be quoted, since it defines a flight hazard area as lying within 3,000 feet of an airport, landing field, etc. For the purpose of making a landing from the northeast, on Runway 4, this would cover most if not all of Flushing Bay. How the occupants of "land in its vicinity" could fall within the purpose of the statute has not been made to appear. Nor how the "descent at a gliding angle of one foot in height to each seven feet of horizontal distance" from the nearest point of such airport, could be computed to the detriment of an 8 foot building distant 175 feet therefrom, has not been demonstrated.

If there were indeed any conflict between this statute, and the Civil Aeronautic Act, which I doubt, the latter would of course prevail. See Northwest Air Lines v. State of Minnesota, 322 U.S. 292, 64 S.Ct. 950, 88 L.Ed. 1283.

It is found that the localizer building and equipment having been duly authorized, installed and maintained by proper action of the C.A.A., did not constitute a nuisance as defined in the State Statute which has been cited, or otherwise.

■ The Government's case is based entirely upon the alleged negligence of the pilot in making the landing too close to the end of Runway 4, to enable the plane to be braked and stopped before that end was reached.

Thus the case is to be distinguished from those based upon trespass, which do not apply.

Nor is there a claim that the plane itself was faulty in construction or equipment. The complaint in the first case, and the answer in the second, tender the issue of "negligence and carelessness" and in the former the language is that the Eastern plane, "while traveling at an excessive rate of speed, in attempting to make a landing at LaGuardia Field New York, was unable to stop within the boundary of the airport and crashed, etc."

In his opening, counsel for the Government stated: "It was purely in his (pilot's) control * * * and it was his fault entirely that the localizer building was damaged * * * it was purely within the province of the pilot whether to land or not to land. It was purely a function that he undertook himself."

Since the latter sentence is not contested, the inquiry turns upon the question of whether his exercise of control, without regard to its result, constituted negligence.

There is no dispute that the ceiling was 500 feet, as the plane approached the landing field, temperature 42°, with light rain, light fog and smoke.

Nor that at about 8:54 P.M. the C.A.A. transferred control of this flight to the control tower operated by the City of New York. The witness Byrnes, the airport traffic controller, was the man in charge. He cleared this plane when it was over Coney Island for an approach to Runway 13 stating that the wind was southeast 10 M.P.H.

This approach was missed, and the plane climbed northeast for a new approach.

That was decided upon by the pilot when he was over the middle radio marker about 4,000 feet from the field, and had descended to 300 feet. "I then decided that under present weather conditions it was unsafe to circle and land on runway 13. * * * I decided to call it a missed approach."

He asked the tower for and received, permission to go around for another approach, which involved climbing to 1,500 feet and return to Coney Island.

Incidentally it was agreed between the pilot and the tower that the former would adopt the automatic direction finder procedure, i. e., the use of a radio compass in the plane to govern direction.

The pilot this time was cleared to land on Runway 4, and testified that the surface wind was reported to him as southeast 8 to 9 M.P.H. at about 9:10 o'clock.

792

Runway 4 ran southwest and northeast, which means that a southeast wind would make a cross-current, not a following or tail wind.

The instruction was accepted and the plane descended to 500 feet (heading northeast), then to 300 feet when over the middle marker.

The pilot testified: "Then I realized I was coming in a little bit too fast and I decided to go around for the third time." We resumed climbing power or tried to, but the left engine didn't take hold. He realized that "My left engine was out."

He testified, "Well there was only one thing to do when it became an emergency and I was unable to go around for the third time on one engine, and the only thing left to do was to get it on the runway as soon as possible."

He landed at an estimated speed of 75 to 80 M.P.H. The plane bounced and after that stopped, he applied the brakes but they did not hold because of slush, with the result previously stated.

He testified that he would not have accepted the clearance for Runway 4 if he had known that in fact the wind was blowing from the southwest, at 13 M.P.H., thus exposing the plane to a tail wind.

The actual direction and force of the wind at the time of the second approach does not appear with sufficient clarity in the record to admit of a definite statement on the subject, but Byrnes said that when the ADF approach was being agreed to "I had given Eastern 14 (this flight) the wind direction and velocity which was gradually getting around to the southwest."

The above recital as to the navigation of the plane is intended to constitute a finding on the subject.

The court lacks the temerity to assume to say that the conduct of the pilot was negligent.

Such a conclusion could be justified only if the evidence could be seen to demonstrate that the second approach was at too high a speed to accomplish the purpose of safely landing on Runway 4 at a place which would insure ample room for braking. There is no such testimony.

Further the court would be required to decide that the attempt to circle around for a third approach, was some evidence of negligence. There is no such testimony.

Further, that the left engine went out of service through some fault of the pilot. There is no such testimony.

Finally, that confronted with the necessity for prompt decision, he made the wrong one. There is no such testimony. Thomas, Aviation Safety Inspector of the C.A.A., on cross-examination is understood to have cast doubt upon the argument that the pilot's decision was wrong.

Even if an untutored court should incline to that notion, which this one does not, it would still be true that the time for reflection on the part of the pilot after the engine failure, and his election to land, was at best a second or two. Since he believed that he could not get the plane up under one engine, he had to choose to do that which would seem to be safest for the lives of those on his plane, and if indeed he erred, which I think the evidence fails to demonstrate, it was not the kind of an error that could be defined as negligence. Of course an ultimate landing would be required, and whether one engine alone could accomplish the purpose presented the problem that had to be solved almost at once.

In view of the entire testimony on the subject, the finding is that the Government has failed to sustain its burden of proof on the subject of the alleged negligence of the pilot.

Not that the precise facts are the same, but that the circumstances confronting a pilot in a given emergency must be weighed carefully in reaching a decision on the subject, see Chapman v. U. S., 5 Cir., 194 F.2d 974.

This was not a res ipsa loquitur case as it was tried: Holtfoth v. Rochester General Hospital, 304 N.Y. 27, 105 N.E.2d 610, 31 A.L.R.2d 1113; Lobel v. American Air Lines, 2 Cir., 192 F.2d 217 at page 220, is not understood to announce a rule to the contrary.

Conclusions of Law.

1. Eastern has failed to sustain its burden of proof in case No. 10,810.

2. The United States has failed to sustain its burden of proof in case No. 10,933, as has the defendant in reference to its counterclaim.

Judgment is ordered dismissing each complaint on the merits, and the defendant's counterclaim in case No. 10,933.

The court is indebted to both counsel for their helpful briefs.